## FRANK BARKER V. STATE OF NEBRASKA.

FILED APRIL 5, 1905. No. 13,919.

1. **Information.** The information in this case, which is a copy of the one set out in the opinion in *Willis v. State*, 43 Neb. 102, charges the accused with the crime of murder in the first degree, and is sufficient to sustain a conviction of that offense.

2. **Instructions: REVIEW.** Objections to the instructions of the district court will not be regarded unless the record affirmatively shows that they were excepted to and called to the attention of that court by a motion for a new trial. Rule relaxed in cases of capital punishment.

3. **Evidence.** The evidence in this case contained in the bill of exceptions is amply sufficient to support the verdict.

4. **Juror: DISQUALIFICATION.** An opinion based solely on rumor and newspaper reports will not disqualify a juror, where it is shown that the opinion is merely hypothetical, and such as will not prevent his returning a fair and impartial verdict upon the evidence adduced on the trial, under the instructions of the court.

5. **Evidence: BOOK OF ACCOUNTS.** A charge against a deceased person in a so-called account book, offered in evidence to show that he was alive on the date corresponding to such charge, is not competent evidence unless it is first shown by whom the charge was made, the time when it was entered in the book, that the book itself is such a book of accounts as is admissible in evidence

under the statute, and that he personally procured the service charged for at the time the entry was made.

6. **Review.** Assignments of error which involve questions (such as the right of the state to prosecute by information) that have been often determined by this court, and have by our repeated decisions been declared to be the settled law of this state, will not be further considered or discussed.

ERROR to the district court for Webster county: ED L. ADAMS, JUDGE. *Affirmed.*

*Hamer & Hamer,* for plaintiff in error.

*Norris Brown, Attorney General,* and *W. T. Thompson, contra.*

BARNES, J.

At the April, 1904, term of the district court for Webster county, Frank Barker was charged with the murder of his brother Daniel Barker and his sister-in-law Alice Barker. He was tried on the first count of the information, which charged him with killing his brother Daniel, and was found guilty of the crime of murder in the first degree, the jury fixing the death penalty; and from the judgment and sentence of the court he prosecutes error.

1. His first contention is that the information does not charge him with the crime of murder in the first degree, and is not sufficient to sustain a conviction of that offense. The length of the information is so great that we cannot copy it in full in this opinion. It is sufficient to say, however, that it charged that the accused, "contriving and intending of his deliberate and premeditated malice one Daniel Barker feloniously to kill and murder, in and upon the said Daniel Barker, then and there being, did unlawfully, willfully, forcibly, purposely, and of deliberate and premeditated malice, make an assault." Then follows a description of the pistol used by the accused, with a minute statement of the shooting; a description of the wound inflicted; a statement of its effect; the death of the

victim, and concludes: "So said E. U. Overman, county attorney as aforesaid, does say that the said Frank Barker, him the said Daniel Barker unlawfully, purposely, and of his deliberate and premeditated malice, did kill and murder, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the state of Nebraska." In fact the information is identical in form and substance with the one quoted in *Willis v. State,* 43 Neb. 102, and which was approved by this court by the following language:

"The information charging the plaintiff in error with the crime of murder in the first degree and on which he was tried, set out in the opinion and in all things approved."

So it appears that this contention is entirely without merit.

2. It is next contended that the court erred in his instructions to the jury, and such alleged errors are discussed at length under ten different heads, or in that many subdivisions of the plaintiff's brief. An examination of the record discloses that no objections were offered to the instructions and no exceptions were taken to any of them. In other words, it appears from the record that the accused and his counsel apparently accepted them, at the time they were given, as a correct statement of the law. Again, none of the instructions was complained of in the motion for a new trial, and for these reasons we cannot consider the objections now for the first time urged against them. In *Morgan v. State,* 51 Neb. 672, which was a case of murder in the first degree, where the question of the death penalty was involved, the court said:

"Objection to an instruction on the ground that it contains two or more distinct propositions will not be noticed when made for the first time in this court."

In the case of *Lackey v. State,* 56 Neb. 298, the court further said:

"The correctness of the ruling of a district court in giving or refusing instructions cannot be considered here

unless such ruling is first challenged in the district court by motion for a new trial."

The question was also presented in *Ream v. State,* 52 Neb. 375, and the court said:

"An instruction will not be reviewed unless the record affirmatively discloses that an exception was taken thereto in the trial court."

In *Sullivan v. State,* 58 Neb. 796, where the defendant was convicted of murder, it was held:

"Objections to instructions not brought to the attention of the district court by a motion for a new trial cannot be successfully urged in this court."

We may say, however, that, although not required to discuss objections to instructions made at so late a stage of the case, still we conclude that in a capital case it is our duty to satisfy ourselves that the defendant's life has not been put in jeopardy by a misstatement of the law to the jury, and with that end in view we have examined the instructions and find that they appear to be a correct statement of the law, as applied to the facts disclosed by the record.

3. It is also claimed that the evidence does not support the verdict, and that the jury should have found the accused guilty, if at all, of murder in the second degree, only. If the accused were the slayer of Daniel Barker, and the jury have found that he was, the record presents as strong and conclusive evidence that the killing was done with deliberate and premeditated malice as the human mind could well conceive. The evidence cannot be quoted in full in this opinion. The most we can do is to give a brief summary of its purport and effect. It appears that the accused had been keeping company with one Lizzie Rinkle, with a design to speedy matrimony, for over a year and a half. On Friday evening, January 29, 1904, three days before the tragedy, he was at her house. At that time he urged her to marry him immediately. This she refused to do until after March 2, following. He told her at this time of his intention to buy his brother Dan out, in which

event he desired her to marry him as soon as she could get ready. He told her they would take immediate possession of the property and move into the house occupied by his brother; that he was to have all the property which his brother and his brother's wife possessed, except their wearing apparel and keepsakes; that Dan and his wife would go to Denver, and that not later than the following Monday or Tuesday he would have to take them to the train; that it was not known that they intended to go, and he did not want anything said about it; in fact he requested her not to tell what he had said to her about the matter. On the following Sunday, January 31, the accused again visited Miss Rinkle, and informed her that he was quite sure he would buy his brother out, and that if he did he would have to take "Dan and his wife," as he called them, to the train on Monday night. On this occasion Charles Rinkle, a brother of Lizzie, came into the room where they were, and the accused thereupon exhibited a revolver, saying, "Isn't it a daisy"? That he left Miss Rinkle's on that occasion about half past one o'clock in the morning, stating that he was going to his brother Dan's, and if he bought him out he would call again on the following Tuesday or Wednesday; and it was shown that he went directly to his brother's place. On Tuesday night the accused called upon Miss Rinkle again, and informed her that he had bought his brother Dan out, and that Dan and Alice, as he called them, had gone on the Tuesday morning train to Denver; that they had driven his team to Red Cloud Monday forenoon, and sent a boy back with it. At this conversation he informed her that his brother had left everything except the carpets, wearing apparel and keepsakes; that his sister-in-law had taken the carpets. He also said he saw his brother pass through on the train that morning and waved at him through the window. The record further discloses the fact that on Saturday, the 30th day of January, the accused purchased the revolver and cartridges afterwards found concealed on the premises where the crime was committed; that the cartridges con-

tained in the revolver discharged a bullet of the same size
and caliber as the ball found at the base of the skull of
Alice Barker at the *post-mortem* examination.    The evi-
dence also disclosed beyond a reasonable doubt that no
other person saw either Daniel or Alice Barker alive after
Sunday the 31st day of January.   On the following Friday
their bodies were found buried in a hole under a shed on
the premises where they resided, and when found were
destitute of all clothing except their night robes.   The day
before the bodies were found, the clothing, personal effects
and keepsakes belonging to Daniel and Alice Barker, to-
gether with the carpet which they had on their bedroom
floor, and which was covered with large spots of blood,
were found in the hay loft of the barn, covered with hay.
It also appears that the accused had been in and about the
premises, doing the chores and performing what other
labor was necessary in caring for the stock and other
things about the place, each day from and including Sun-
day the 31st day of January until he was arrested and the
bodies were found.

Assuming that the verdict of the jury which found the
accused guilty of the act of killing was true, it appears
from the evidence, as summarized in the foregoing state-
ment, that the accused deliberated and premeditated on
the murder at least three days before committing it.   He
had formed the intent to kill, and planned the mode and
manner of its execution that length of time before the day
of the tragedy.   So there can be no reasonable doubt of the
fact that the act of killing was done by the accused pur-
posely and of his deliberate and premeditated malice.
On the whole, the verdict of the jury is amply sustained
by the evidence and should not be disturbed.

4. It is claimed by counsel for the accused that the court
erred in overruling his objections to H. W. Fowler and
Charles C. Bennett as jurors, for cause; and that by reason
of such ruling he was required to exercise two of his per-
emptory challenges in order to exclude them from the jury.
As the answers of these jurors on their *voir dire* were the

same in substance and effect, the two assignments of error will be considered together. These persons, when examined to ascertain their qualifications to act as jurors, each stated that he had formed an opinion as to the guilt or innocence of the accused, but that such opinion was based entirely on newspaper accounts and common neighborhood rumors. After they had been interrogated by counsel on both sides, the court examined each of them with the following results:

Q. If retained as a juror, do you feel that you could try this case solely upon the evidence introduced here from the witnesses, and render a verdict in accordance with that evidence and the instructions of the court?

A. Yes, I believe I could.

Q. If you were retained as a juror would you do that?

A. Yes, sir.

Q. And dismiss from your mind anything that you have heard in any way as rumors or newspaper reports?

A. Yes, sir.

Q. And you feel now that if you were retained you could render such a verdict from the evidence, as it comes from the witnesses in court, directed by the court?

A. Yes, sir.

Q. Fairly and impartially, and without any leaning, or prejudice or bias for or against the defendant?

A. Yes, sir.

Q. And you will do so if retained?

A. Yes, sir."

On this examination the court overruled the challenges, and it seems that his ruling was strictly in accordance with the provisions of section 468 of the criminal code, which reads as follows:

"If a juror shall state that he has formed, or expressed, an opinion as to the guilt or innocence of the accused, the court shall thereupon proceed to examine, on oath, such juror as to the ground of such opinion; and if it shall appear to have been founded upon reading newspaper statements, communications, comments, or reports, or upon

rumor, or hearsay, and not upon conversations with witnesses of the transactions, or reading reports of their testimony, or hearing them testify, and the juror shall say, on oath, that he feels able notwithstanding such opinion to render an impartial verdict upon the law and the evidence, the court, if satisfied that said juror is impartial, and will render such verdict, may, in its discretion, admit such juror as competent to serve in such case."

This statute has been construed and often upheld; and, in many cases where the answers of the jurors were the same or similar to those above quoted, this court has held that it was not error for the district court, in its discretion, to retain such jurors in the trial of criminal cases. *Palmer v. People,* 4 Neb. 68; *Bohanan v. State,* 18 Neb. 57; *Basye v. State,* 45 Neb. 261; *Dinsmore v. State,* 61 Neb. 418. Whatever may be the rule in other jurisdictions, it is well settled in this state that the court did not err in overruling the objection to the competency of the jurors above named.

5. It is contended that the court erred in sustaining the state's objections to certain questions propounded to the witness W. R. Geer, and in excluding the offer to make certain proof by him. It appears that Geer was working in a shoe store owned by one Smith, in Red Cloud, Nebraska, at or about the time this tragedy occurred; that a shoe was exhibited to him by counsel for the accused, which was identified as belonging to Daniel Barker. It appeared that the shoe had been repaired some time before the murder was committed, but the exact time was not shown. Over the objections of the state, the witness was permitted to testify that he thought he repaired the shoe for Daniel Barker, and that it looked as though it had not been worn after the repairs were made. The accused then offered a book in evidence belonging to Geer's employer, which it was claimed contained a charge, of date of February 1, 1904, of ten cents against Daniel Barker, and which charge it was claimed corresponded to the value of the repairing done on the shoe above mentioned. The state objected on

the ground that it was incompetent, irrelevant and immaterial, and that no foundation for its introduction had been laid. This objection was sustained, and the accused excepted. A mere statement of the matter is sufficient to show that the objection was properly sustained. It contained no accounts between the parties; no proof was offered to show that the book was a regular book of accounts; no testimony was given or offered to show when the repairing was done, when the charge which it was claimed the book contained was made, or by whom it was made, and in fact nothing was shown to render the offer in any manner material or competent. So we hold that the court properly excluded this evidence.

6. Counsel for the accused have argued some other contentions in relation to the admission and exclusion of evidence. We are not required to examine these assignments, for the reason that none of the rulings complained of were particularly challenged in the petition in error. When the error complained of concerns the admission or rejection of testimony on the trial, the record must show that the alleged error was specifically assigned in the petition in error, and it is not enough merely to allege, as was done in this case, "For errors in the ruling of the court in admitting evidence objected and excepted to by the defendant." *Walrath v. State,* 8 Neb. 80; *Dillon v. State,* 39 Neb. 92; *Wilson v. State,* 43 Neb. 745; *Berncker v. State,* 40 Neb. 810.

7. Counsels' brief contains some other assignments of error, which relate to questions that have been so frequently determined by this court, and are so well settled, that we decline to discuss them. Nevertheless, for the reason that this case involves the execution of the death penalty, we have carefully read the whole record, and examined every question presented, in order to make sure that the trial court had properly and carefully guarded the rights of the accused; and, after due consideration, our conclusion is that the record shows the commission of one of the most brutal and deliberate murders recorded in

the history of the state; that the facts and circumstances disclosed therein are not only consistent with the guilt of the accused, but inconsistent with any other rational conclusion, and in the trial of the case there was no reversible error.

For the foregoing reasons, the judgment of the district court is in all things affirmed; and it is ordered that Friday, the 16th day of June, 1905, be and the same is hereby, fixed and appointed as the day for carrying into execution the judgment and sentence of the district court.

AFFIRMED.