FRANK E. SHARP v. STATE OF NEBRASKA.

FILED JUNE 27, 1928.   No. 26320.

*Max V. Beghtol* and *Donald Gallagher,* for plaintiff in error.

*O. S. Spillman, Attorney General,* and *George W. Ayres, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, THOMPSON, EBERLY and HOWELL, JJ.

HOWELL, J.

Error to the district court for Lancaster county, prosecuted by Frank E. Sharp, sentenced to death for the killing of his wife.

The case is here for the second time, a prior similar sentence having been reversed in *Sharp v. State,* 115 Neb. 737, because of errors not now before us.

The information charged Sharp with "unlawfully, feloniously, purposely, and of his deliberate and premeditated malice" killing Harriet A. Sharp.

Seven errors are assigned for the reversal of the judgment, summarized as follows: (1) Overruling defendant's objection to swearing the jury, because of conscientious scruples against imposing a death penalty, on the part of many jurors excused for cause; (2) overruling defendant's challenge, for cause, of Juror Carey; (3) error in giving instruction No. 5; (4) excluding the deposition of one William Evans offered by defendant; (5) excluding the opinion of William Evans as to palm prints, offered for testing the knowledge of Carmody, a state witness, on that subject; (6) the court's refusal to dismiss the information as to first degree murder for insufficient evidence to show defendant "deliberated or premeditated the crime;" (7) the evidence does not support the verdict. These assignments will be considered seriatum.

(A) It is contended that section 10134 (3), Comp. St. 1922, which reads: "In indictments for an offense the punishment whereof is capital, that his (juror's) opinions are such as to preclude him from finding the accused guilty of an offense punishable with death," etc.—does not disqualify

a juror who answers that he possesses conscientious scruples against "the inflicting of the death penalty on a first degree murder."

*Haddix v. State,* 76 Neb. 369, 376, discusses the question, and there is dicta which seems to favor the contention, but it was followed by the statement: "The question, however, presented in this record is whether, under *any circumstances,* any conviction or prejudice of the juror, *however strong,* even if it would preclude the infliction of the death penalty, should be ground for challenge. * * * A juror, then, who has such opinions as to preclude him from inflicting the death penalty in any case * * * is not, therefore, qualified," etc.

Juror Termaah said, "I believe I have" conscientious scruples "against death penalty on a first degree murder charge," but no opinion that would prevent a verdict for first degree murder if he could punish in some way other than by death. This probably presents the most meager ground for challenging any juror. The juror was examined by defendant's counsel. He did not seek to develop how deep-seated were the juror's scruples, although he was afforded ample opportunity, and was in no way prevented from making full inquiry. The juror might have been able to disregard his scruples in fulfilling his sworn duty to enforce a law, even though he would not favor such a law originally. The accused was not legally prejudiced by having a juror excused who, so far as shown, might under some state of facts enforce the extreme penalty provided by law. Defendant could not legally demand a juror who would not fully enforce the law. Jurors and judges enforce laws every day against which they may have a prejudice in the sense that they may not believe them to be wise enactments. No conscientious juror or judge will allow his convictions as a unit of society to obstruct laws enacted in the manner prescribed by society as a whole.

Perhaps the other extreme arose in the case of Juror Engel. He said he had conscientious scruples against the

death penalty, irrespective of the verdict, the amount of testimony, or circumstances.

We have read the *voir dire* examinations of all jurors excused for conscientious scruples. The two instances stated illustrate extreme views. The views of the other excused jurors fall somewhere between.

The question is exhaustively discussed in *Rhea v. State*, 63 Neb. 461. In addition to the cases there cited, that case has been followed in *Pumphrey v. State*, 84 Neb. 636, and *Taylor v. State*, 86 Neb. 795, 805. In the last case, it is said: "It thus appears that this question is so well settled that a further discussion of it is unnecessary, and it must be resolved against the defendant's contention."

(B) It is next contended that the court erred in overruling defendant's challenge, for cause, of Juror Carey. This juror said he lived in University Place, heard of the case, had talked about it some with a relative of the deceased, who lived in University Place, two or three months after the first trial was over with; thought he had no opinion of guilt or innocence, and had no conscientious scruples against death penalty as long as it is in the statute, and would abide by the evidence; not acquainted with Carey family living in Bethany who were witnesses; never talked with any of them; slightly acquainted with Wilson family in University Place; talked with Mr. Wilson about the case; not intimate with him; never knew him until the summer of 1927; in real estate business in University Place 17 years; talked no more with Wilson than what had been in the papers; was assessor and, when doing that work, the case came up; thinks Wilson naturally evidenced a little bitterness, he being a relative, but did not exhibit a great deal of animosity toward Sharp; did not remember just what was said; thought "he told me no more than I had read in the newspapers;" from what he read and was told by Wilson, rather thought he formed an opinion at that time; it was not caused by what Wilson said, but by reading the newspapers only; thought it could be changed by

evidence, but felt that something would have to be shown to change his mind. The juror was then challenged and the court examined him. Thought he could put such opinion out of mind and enter upon the trial of the case without any opinion, and decide on the evidence just the same as though he had never had any such opinion; did not think he had a definite opinion, but would naturally have ideas as to what the evidence was; heard nothing but what he could decide on the evidence as given; may have had the facts confused, at the time he formed the opinion, "but, of course, I said I could decide on the evidence." Notwithstanding any view he may have had, based upon the reading of the newspapers, juror thought he could take his seat as a juror, hear the testimony, listen to the instructions, and forget all about any view he had upon it, or opinion, and consider the case upon the evidence and the instructions of the court, and felt absolutely certain he could do so, and could and would put aside any opinion or viewpoint he ever had, and enter upon the trial with such freedom of mind that would not require any evidence to be produced to put such a previous opinion out of his mind; he voted for Mr. Towle for county attorney. The challenge was overruled, and legally so, although we think the question here presented might well have been eliminated by the trial court in the exercise of its statutory discretion, in so serious a case where life is at stake. *Ringer v. State,* 114 Neb. 404; *Barker v. State,* 73 Neb. 469.

(C) The next error relates to instruction No. 5, given by the court. It is based upon the following words: "If you find beyond reasonable doubt that defendant purposely, intentionally, maliciously, deliberately, and with premeditation, killed his wife, * * * you will find him guilty of murder in the first degree," etc. The only complaint is the failure of the court to insert the words "from the evidence" after the words "reasonable doubt," claiming that the court gave the impression that the jury were at liberty to indulge in speculation and conjecture. We cannot

agree. The rule that instructions must be construed reasonably, in their entirety, is so well established that we no longer cite authorities to support it. The second paragraph of the instructions given plainly told the jury that one charged with a crime is presumed to be innocent until proved guilty beyond a reasonable doubt, "and, before you can properly find the defendant guilty, you must find that his guilt has been established by the evidence beyond a reasonable doubt." The next paragraph defines reasonable doubt.

The fourth paragraph states it is undisputed that Harriet A. Sharp was killed during the night of March 16 and 17, 1926, and the jury should "at once turn your attention to the question of who did the killing." Then follows the language complained of in instruction 5.

Paragraph 14 of the instructions says: "You should consider this case upon the evidence introduced and the law as given by the court." It is to be presumed that jurors are ordinarily intelligent men, and it is difficult to see how any such persons could understand, or be led to believe, that they were to speculate or engage in conjecture about the necessity of finding the defendant guilty, from anything but the testimony introduced upon the trial.

(D and E) The next errors complained of relate to the exclusion of a so-called deposition of Captain William Evans whose testimony was sought in Chicago. He refused to testify. As the record disclosed, there had been correspondence between Captain Evans and Mr. Beghtol, counsel for accused, concerning the palm prints of defendant's hands. His counsel state that, as Captain Evans was a world renowned fingerprint expert, had an opinion and had conversed with Carmody, a state witness, concerning the same, the so-called deposition should have been received to overcome any presumption that Evans entertained opinions adverse to the accused. They say defendant should have been permitted to show thereby that Captain Evans refused to testify, and they should have been permitted to

test the knowledge of the expert Carmody by using the opinions held by Captain Evans which were expressed in letter form. These are novel claims. Mr. Towle and Mr. Beghtol were present in court and both had personal knowledge of the refusal of Captain Evans to testify. To prevent an adverse presumption, as was feared, Mr. Towle could have been called to so testify. Besides, the record clearly shows Captain Evans' refusal. As to the correctness of the refusal of the court to allow questioning Carmody about the letter of Captain Evans, we entertain no doubt. The letter was not under oath; it was not in evidence; and, at most, would be hearsay. It might have been proper to question witness Carmody generally as to whether he knew the opinions of, and had talked with, Captain Evans; that they examined the prints together, and that the prints examined were properly identified, and, after talking with Evans, the witness was made less certain of his own testimony. Those matters could have been put directly to the witness, and they were, to a certain extent, but not fully pursued.

(F and G) The next assignments are (F) the refusal of the court to dismiss the information as to murder in the first degree, for insufficient evidence to show the defendant "deliberated and premeditated the crime," and (G) the evidence does not support the verdict. These two assignments may be taken together. Both depend upon the evidence as a whole.

Until now, we have not been troubled with any of the assignments. The principal question is as to the sufficiency of the evidence to support the verdict.

Preliminary to the discussion of the evidence, it may be well to state what is malice, deliberation, premeditation, and, incidentally, motive.

Murder, as defined by section 9544, Comp. St. 1922, in a case like this, is the killing of another "purposely and of deliberate and premeditated malice." The charge is that defendant "unlawfully, feloniously, purposely, and of a de-

liberate and premeditated malice," killed Harriet A. Sharp.

Malice may be said to exist when the heart is dead to social duty, bent upon prohibited mischief, and there is a deliberate mind to kill. 29 C. J. 1084, sec. 61; *Vollmer v. State,* 24 Neb. 838; *Carr v. State,* 23 Neb. 749; *Davis v. State,* 51 Neb. 301; *Housh v. State,* 43 Neb. 163. It is nothing more than the existence of a mental state, however sudden or abbreviated in point of time. *Francis v. State,* 104 Neb. 5; 29 C. J. 1113, sec. 97. Motive is not essential to prove malice, deliberation, or purpose. *Pointer v. United States,* 151 U. S. 396, 413. Malice may be shown by acts and the manner of their performance. Where the mind of the actor is sound, or rational, in the sense that it comprehends, the fact of killing, the manner of accomplishment, total absence of circumstances tending to show justification or mitigation may, and often do, show undeniable malice. When deeds result in killing, and can be interpreted in no other sense than cruel, brutal, savage and deliberate, they may establish unmistakable malice, whether or not motive is shown. Motive is not an essential element of murder. Its presence or absence is material in determining whether the killing was done by accused and was malicious and premeditated. If it appears that the accused killed his victim in a persistent, cruel and barbarous manner, without provocation or justification, malice, in the legal sense, is proved. In such case, proof of motive would not make guilt more certain.

The proofs in this case show that the deceased was beaten to death by fifteen or more blows from a hammer, owned and in possession of accused, which could not have been used for any innocent purpose. Deceased was defenseless. It is claimed that any one of the several blows would have killed, and, therefore, only the first can be considered in interpreting the state of mind of the accused. The statement does not seem to afford a foundation for judicial discussion. The case calls for a careful and patient inquiry.

The accused was about 50 years old. January 3, 1924, he

married deceased who had four children, three of whom lived with them until about 8 o'clock p. m. on March 16, 1926. During much of the intervening time, accused and deceased did not live in peace, but had many quarrels; during the day of the murder, they had been arguing and were unfriendly. Accused was "mad" when they left home between 7 and 8 o'clock in an automobile, ostensibly to go to a dance. They went to the home of one Wilson, a relative of deceased, in University Place, where they visited a few minutes, about 8 o'clock, in apparent good humor. From there, they started east. Neither was again seen by any witness until about 10:30 o'clock that evening, when accused appeared in the street near the home of one Carey a few city blocks northeast of the Wilson home, where he attracted attention by holloing and repeating he had been robbed of his coat, money, watch and wife. One Donohoe at the Carey home went into the yard and talked to accused, who was blindfolded and whose hands were bound behind him by heavy wire. The blindfold was tied in a tight, hard knot. In releasing the hands, Donohoe "just pulled" them apart, the wire being tight on the left hand, but loose on the right.

Accused went into the Carey home; cold beads of sweat were standing on his face; he was shivering and seemed very cold; exhibited hands and wrists to witnesses, calling their attention to marks; they saw no blood.

Accused then went, three times, with officers, over the route he said he was taken by robbers, claiming he could follow the course by reason of the motion of the car in its turnings, and because of rough places, street-car tracks and elevated sidewalks over which they passed. At times, he directed, in advance of reaching turns, crossings, tracks and walks, where to make turns. He said he had been robbed of *all* of his money. The following morning, he borrowed a dollar with which to purchase breakfast, saying he had no money. When officers removed his clothing, they found four $1 bills in his trousers watch-pocket, which

he later explained by saying, on some prior occasion he and his wife attended a dance and found when he changed his trousers he had no money, and then made up his mind he would not be caught in that fix again, so he put $4 in his trousers watch pocket for future emergency.

He said he and wife left the Wilson home about 8:15 to 8:20, going east; his wife spoke of a flat tire; he turned south, one house was "all lit up," and he said to his wife, "We will stop in front and look at the tire;" got out of his car; a car came from the south and stopped; a man said, "I'll fix it for you, you get back in the car," and stuck a gun on him; the man told accused to drive; he got behind the wheel and two men got in; when the man with the gun got in, accused's wife looked around and said, "My God" or "My goodness," and collapsed; they drove 200 feet beyond a culvert and was told to stop; accused had been ordered to take off his overcoat, and a man said, "I will take care of that overcoat," and took it; another fellow in the car said, "Take off your coat and vest," which he did; he was then ordered to "Take off your shirt;" accused took off his collar, tie and shirt and handed them over, and then asked, "Can't I put my coat and vest back on?" and the man said, "Yes; I guess so;" accused did so and handed the man the overcoat; then another car drove up behind "just as I was handing my overcoat to him;" the other man took the overcoat, so accused could not see him, and put it over the lights of the other car; the man tore up the shirt of accused; accused put on his coat, vest and necktie and buttoned up the vest; then the other man blindfolded him; accused had $4 in the watch pocket, and the robbers took $12.25 or $12.35 from his pants pockets; was in the front seat of his own car when blindfolded; robbers took his money right after he was blindfolded (before that, he testified he didn't know whether they took his money or watch before or after he had been blindfolded). One man ordered him out of the front and into the back seat of the car, and there searched him. The man first

wired one hand and then the other. One man got into the car and sat in the back seat with him; tramped on his feet; the man drove around with accused and Mrs. Sharp; one man said, "Head toward Omaha;" drove around 15 or 20 minutes after they got to going; did not know exactly where he was put out of car.

In trying to get out of the car, accused struck his wife's head; was told to "Get out of here;" as he got out, he slipped and bumped nose on side of the car; blindfold was then over both ears and eyes; had feet between seats to brace himself; one man reached across and put his knees against accused's leg and was doing something with accused's wife; accused could feel, by the spring of the seat, man was surging; car sounded like it struck the "X" with a thud; last heard the thud when man quit surging; man was doing something with wife when he had his knees against accused; man was pushing wife against leg of accused; did not hear any blows struck; the commotion happened twice, the first not very long after man got in the car; drove 10 or 12 blocks; went over a high sidewalk, rougher than before, and the same things happened again; still blindfolded when accused last got out of car; when accused got feet on ground, man said, "Stay here and we will be back, and if you are not here we will fill your hide full of bullet holes, so it will not hold shucks;" then the man closed the car door and drove away; accused heard another car stop a little way off; after the car passed, accused got into the center of the road, scraped his feet along until he found the road where a car had been during the day when it was thawed out; stood five or ten minutes and heard two cars go by to the north, then went about a block; heard street-car; followed the track back south to where he heard the street-car; then heard a dog; tried to release himself; didn't try to do much, as there was nothing he could do; went a little further and heard a door shut; holloed 12, 15 or 20 times, and a lady answered, who turned out to be Mrs. Carey; Donohoe took the bandage off and

accused asked him to take the wire off; denied that the blood spots were found on any of his clothes except his vest; when the officers spoke of blood, he did not tell them of slipping and striking his nose on the car, or hitting against his wife's head; hurt his nose when he slipped and fell (at that time, the nose was covered with the blindfold, and there was nothing visible to show there was any blood on the blindfold). Accused claimed the robbers turned round at a certain place in the road, describing it. A witness, with a flashlight, examined the road and there were no tracks, although the grading was fresh.

While at the Carey house, accused spoke of having $4 in his watch-pocket, saying he did not know whether the robbers got it or not, and then pulled out the money and showed it to witnesses, and put it back in his pocket, indicating that he knew of the $4 before he borrowed the $1 for breakfast.

At a creek bank, not far from the place where the death car was found, foot-prints were discovered, which were measured and were practically the same as those of accused. The shoes of accused fitted into the tracks, and they corresponded.

Accused was put out of the car and left by the robbers not far from the Carey home.

Before the body of deceased was found, but after accused felt he was suspected, one Jones asked him where he got all of the blood on him, and was told, "I don't know, but it didn't come off of that woman." There were blood spots on several garments and shoes; some blood had soaked through the trousers onto the underclothing; the car and body were found about 4½ miles north of Carey's place; a flashlight, which one witness testified belonged to accused, was found buried in loose earth around a telephone pole. Senator Jeary experimented with tracks made by Sharp's shoes, and compared them with footprints found near the creek bank. He testified they were exactly the same.

The death car was found in front of Schmidt's place, near which there was a puddle of blood; at 8 p. m., on the night in question, it was not there. Schmidt's sister visited him between 8 and 9:20 p. m. at his home; car was not there at 8 p. m., but was there about 9:10 to 9:20, and was there the next morning. The distance from the point, where accused said the robbers put him out of the car to the Carey house is three or four blocks. The distance traveled from the Wilson home, over the route followed by robbers, to the place where accused was last put out of the car is about 50 blocks, or about 3 1-2 miles. To walk from the latter place to the Carey home, as nearly as we can judge, accused had from 9 o'clock, or a little before, until 10:30. To walk from where the death car was found, if accused was there, he would have had approximately from 9:10 or 9:20 until 10:30. Some time was spent by the accused with the robbers—perhaps 25 to 35 minutes, according to his own story. According to the testimony of others, the death car had reached Schmidt's place not later than 9:20 p. m.; so, within about one hour from the time the accused left the Wilson home (about 8:10 or 8:15), the death car was seen at the Schmidt place. Palm prints of the hand of accused, connecting him with murder, were proved.

There are other facts and circumstances shown, of more or less minor importance, which we will not attempt to detail.

As against the foregoing, we have the unsupported testimony of the accused and a few speculative circumstances of little import. The robber theory is not convincing. So far as known, the deceased was assaulted only while she was being murdered with hammer blows, and had no money about her. There is no intimation that any one suspected deceased had money. No greater motive or reason for murdering deceased than the accused is even suggested. Accused had some opportunity for identifying the robbers, as they were in front of the house "all lit up," at least as much as did deceased. If the murder was com-

mitted by robbers, their actions were most peculiar. The accused first stopped his car for the purpose of looking at a flat tire. That must have taken a minute or so. Two robbers in a car, accused said, drove up and stopped. They were there with the accused and deceased alone for a time; then came a third car, with another robber who seemed to know precisely what was going on and what was expected of him by his associates, his conduct being such as would indicate a connection with the other two robbers. The first two robbers were not alarmed by the appearance of the third. The third robber apparently pursued the same objective as the first two.

The third robber could not have worked in such perfect harmony with the others without predeliberation. It is inconceivable that three men would jointly follow a predetermined sexual assault.

The story of the accused is hard to reconcile with any common sense view of the evidence. No person was seen with the deceased, or known to be with her, between 8:20 and about 9 o'clock, when the death car was found before Schmidt's home, except the accused. That the deceased fainted on sight of the robbers, and no blows were struck while accused was with the wife, is significant. If robbery was the motive, it could have been accomplished without resistence or alarm from an unconscious woman. If it be suggested that another kind of assault was intended, it would seem ridiculous to say that three men would join in such an aggregated and conglomerate prosaic act.

The jury having heard the evidence and reached its conclusion, a most rational one, it is not for this court to disturb their verdict. The accused served a felony term a number of years ago in the penitentiary of this state. While we do not attach much importance to that incident, yet, when taken with all the other facts and circumstances and seeing and hearing accused testify, it was a matter for the jury to consider in determining his credibility. A prior jury, having heard practically the same testimony,

came to a like conclusion. They were the triers of fact, made so by law.

While the writer of this opinion has no fondness for capital punishment, he has neither inclination nor desire to evade responsibilities imposed by law. In *Deerkop v. State,* 196 Wis. 571, decided May 8, 1928, a conviction of first degree murder was affirmed on circumstantial evidence showing far more weakness than the evidence before us, but having some similarity. The court concluded with this language: "If the story of his whereabouts * * * appeared to be a fabrication, the jury were warranted in believing that the defendant and the deceased repaired to Williams Lake * * * and that the defendant came away * * * after the deceased had been murdered." This is applicable to defendant's story that he was not in the vicinity of the death car in front of Schmidt's place on the evening of the murder. If the foot-prints found a short distance from the death car were made by accused, then, of course, his story was a fabrication. If it be conceded that the accused murdered his wife, it would be difficult to find a more fitting occasion for the application of the death penalty than is here presented. We must concede that he did. The jury have so found. They fixed the penalty of death, as they had a legal right to do. Accused has had a fair trial, free from error, even of a technical character. The verdict of the jury and the judgment of the district court are approved and affirmed, and Friday, the 19th day of October, 1928, between the hours of 6 o'clock a. m. and 6 o'clock p. m., of said day, is fixed as the date for carrying into effect the sentence of the district court.

AFFIRMED.