STATE OF NEBRASKA, APPELLEE, v. LAWRENCE J. ORTIZ, APPELLANT.

192 N. W. 2d 151

Filed December 3, 1971. No. 38022.

Jeffrey L. Orr and Richard J. Bruckner, for appellant.

Clarence A. H. Meyer, Attorney General, and Calvin E. Robinson, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

NEWTON, J.

The defendant, Lawrence J. Ortiz, appeals from a conviction of murder in the first degree. He challenges the sufficiency of the evidence to sustain the conviction and asserts there was error in the admission of evidence and in a denial of the right to introduce surrebuttal testimony. We affirm the judgment of the district court.

The defendant and one Charolette Elaine Whittington had traveled to Ohio and then back to Omaha, Nebraska, together. On the evening of Friday, August 28, 1970, they drove to Lincoln, Nebraska, and registered together in a motel. On the next evening, Saturday, they were out eating and drinking until about 1:30 a.m. Sunday morning. The defendant registered alone at a motel in Kearney, Nebraska, at about 9:30 a.m. on Sunday, August 30, 1970. He remained at least until evening but was gone at 7 a.m. Monday morning and in the early afternoon of Monday, August 31, 1970, sold his automobile to a Lincoln used-car dealer. He was taken by taxicab from a Lincoln hotel, together with his luggage, to a bus station that same afternoon and told the driver he was in a hurry to catch the bus. His automobile was subsequently found to have human blood spots on the rear floor mat and on the chrome strip under the right door.

On the afternoon of Monday, August 31, 1970, a grass or brush fire occurred in an area adjacent to the Platte River approximately 15 miles west of Kearney, 3 miles south and 1¼ miles east of Elm Creek, Nebraska. The body of Charolette Elaine Whittington was found on the edge of the burned patch. The clothing was pushed up

under the armpits and there were marks indicating it had been dragged from a lane referred to as a river trail.

The autopsy revealed that Charolette had been badly beaten around the face and head with several teeth being knocked out and her hands had been severed. These do not appear to have been found. The body was burned in certain areas and was practically bloodless. The doctor testified that the only blood he obtained, about a tablespoonful, had to be obtained directly from the heart. He further stated that after death occurs, there would be little bleeding, only a little seepage, that there were no major lacerations of the scalp, and death was unlikely to occur from bleeding at the lips which revealed the worst lacerations. The only large lacerations found resulted from the cutting off of the hands. Death resulted from trauma and he could not fix the time of death but said she may have been dead a day or two. Examination of the blood revealed very small quantities of alcohol and barbiturates. Not enough to cause death.

After defendant's arrest, while being fingerprinted by a deputy sheriff, he informed the deputy "that he and this other woman had an argument after a dinner," that she borrowed his car to get "a fix," and he went to sleep. The next morning his car was back at the motel, but she did not appear. He saw blood in the car and got scared but did not notify the police.

Defendant's evidence indicates Charolette was a narcotic addict, an informer who was in trouble with unspecified black people in Omaha, and afraid of reprisals. His own testimony indicates that on the return trip to the motel early Sunday morning, she called someone about getting "a fix"; two men called at the motel for her and she left with them, taking defendant's car; he arose about 8 a.m. that morning, found the car, but did not find Charolette, called her cousin in Omaha to learn if she were there and on being told she was not, thought she may have gone to Grand Island or Kearney as they

had been talking of visiting relatives of hers in that area. He did not know where the relatives lived, but drove to Grand Island, looked in the bars, and then went on to Kearney. Not finding her, he returned to Lincoln where he claims to have stayed for 4 days. Then on reading about Charolette's death, he became frightened, knowing of his own past record, and went to Wichita, Oklahoma City, Albuquerque, and Texas before returning to Omaha.

The evidence is circumstantial for the most part, but we believe it is sufficient to sustain the verdict. The evidence of the State indicates defendant was the last person to see Charolette alive. He was in the general vicinity of the place where the body was found as early as 9:30 a.m. on that Sunday morning, when her death had to have occurred, and there were human bloodstains in his automobile. Fibers similar in color and texture to those used in the rear floor mat of defendant's car were found on Charolette's clothing. In addition, he had volunteered to a deputy sheriff that: "* * * he and this other woman had an argument after a dinner." He failed to notify the police when she disappeared and fled to the southwest after disposing of the bloodstained car. The defendant's story of Charolette's leaving with strangers is completely uncorroborated. Had the strangers killed her, they would have had to transport her body to the spot where it was found. His own account of his actions is not conducive to belief. He told the deputy sheriff that he saw bloodstains in the car on Sunday morning, but omits this in his testimony. If he found bloodstains, he must have suspected something had happened to her. Notwithstanding, he failed to notify the police and instead now says he thought Charolette had gone to visit relatives in the area where her body was found. This conflicts with his theory that she was killed by the two strangers. He fails to explain how he expected her to get there or why she should leave without his knowledge. Also, he claims not to have left Lincoln until after 8 a.m. and to have looked through

the Grand Island bars on his way to Kearney yet he was in Kearney at about 9:30 a.m., checked into a motel, and, according to his statement, left the same day.

"In order to warrant a conviction on circumstantial evidence the circumstances taken together must be of such a conclusive nature and tendency as to produce a reasonable and moral certainty in the minds of the jury beyond a reasonable doubt that the accused committed the offense charged. * * *

"It is the province of the jury to determine the circumstances surrounding, and which shed light upon, the alleged crime; and if, assuming as proved the facts which the evidence tends to establish, they can be accounted for upon no rational theory which does not include the guilt of the accused, the proof cannot, as a matter of law, be said to have failed." State v. Ohler, 178 Neb. 596, 134 N. W. 2d 265. We find that the evidence fails to reflect any reasonable hypothesis of innocence but on the contrary, sustains a rational theory of guilt.

Defendant contends that the essential elements of premeditation, deliberation, malice, and purpose or intent to kill have not been proved. These elements are mental processes which are conceived and hidden in the mind. They are rarely susceptible of proof by direct evidence but must be ascertained by reference to such outward manifestations as the acts of the person concerned and from all the facts and circumstances. In the present instance, the jury could reasonably find that Charolette bled to death from the severance of her hands. The undisputed medical evidence indicates that her body was drained of blood which could only have occurred while her heart was still beating and that her other injuries could not have resulted in such extensive bleeding. They could also find that defendant was aware, as a matter of common knowledge, that bleeding and death would ensue from such injuries. The severing of the hands was of necessity a deliberate and premeditated act and when performed while Charolette was still

alive, although probably unconscious, may well have been deemed by the jury as intended to bring about her death. If so, the elements of malice, intent to kill, deliberation, and premeditation were necessarily present. A person of sound mind is conclusively presumed to intend the obvious and probable consequences of his voluntary act. See, Baskins v. State, 138 Neb. 334, 293 N. W. 270; Reizenstein v. State, 165 Neb. 865, 87 N. W. 2d 560.

It is asserted that exhibits consisting of pictures taken of the body at the location and in the condition found were erroneously admitted because not competent and relevant. These pictures served to show the nature of the area where the body was found, the conditions resulting from the brush fire, the condition of the body, the nature of the injuries, and the arrangement of the clothing which indicated it had been dragged. The foundation evidence is unchallenged and this evidence was relevant and material. Two exhibits consisting of pictures of portions of the body taken after its removal are likewise criticized. These pictures were introduced to show certain peculiarities found on the body which facilitated identification. They too were relevant and material for the purpose used. "A photograph proved to be a true representation of the person, place, or thing which it purports to represent is ordinarily proper evidence of anything of which it is competent and relevant for a witness to give a verbal description." State v. Robinson, 185 Neb. 64, 173 N. W. 2d 443. See, also, Davis v. State, 171 Neb. 333, 106 N. W. 2d 490.

The State produced one rebuttal witness, the taxicab driver who testified to taking defendant to the bus station. Defendant now asserts error on the ground he was denied the right to answer or rebut this testimony. At no time did defendant request this or indicate to the court that he desired to introduce evidence of this nature. The assignment is without merit.

No error appearing, the judgment of the district court is affirmed.

AFFIRMED.