STATE OF NEBRASKA, APPELLEE, v. ROBERT L. BEERS, APPELLANT.

271 N. W. 2d 842

Filed November 22, 1978. No. 41854.

Richard H. Hoch of Hoch & Steinheider, for appellant.

Paul L. Douglas, Attorney General, and Harold Mosher, for appellee.

Heard before SPENCER, C. J., PRO TEM., BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ., and KUNS, Retired District Judge.

CLINTON, J.

The defendant, Robert L. Beers, was charged with having killed Gary White, a Nebraska City policeman, purposely and with deliberate and premeditated malice, on July 9, 1977. Defendant was also charged with having on the same day maliciously shot Peter Rischel, also a Nebraska City policeman, with the intent to kill, wound, or maim. He was found guilty of both crimes by a jury and was sentenced to a term of life imprisonment on the first charge and a term of 16 years and 4 months to 50 years on the second, with the latter term to be served before commencement of the life sentence.

On appeal to this court, defendant makes and

argues three assignments of error: (1) The evidence is insufficient to support the conviction of murder in the first degree because there is no evidence of deliberation and premeditation. (2) The court erred in permitting a witness to the shootings, Steve Gruber, to give his opinion that the first shots he heard were those of a shotgun. (3) The court erred in failing to include in its instructions, with reference to the first charge, one which defined and would have permitted the jury to find the defendant guilty only of manslaughter.

We find the assignments of error are not meritorious and affirm the judgment.

Consideration of the first assignment of error requires a summary in conclusional form of the evidence supporting the charge. The testimony of eyewitnesses, admissions of the defendant, physical evidence at the scene, expert testimony, and reasonable conclusions from such evidence would permit the jury to find the following beyond a reasonable doubt.

On July 8, 1977, Robert L. Beers and his wife, residents of Nebraska City, were estranged and living apart. Beers was seeking a reconciliation. During the day of July 8, 1977, at his wife's request, he brought their two children to the place where Mrs. Beers lived for a visit. During the visit, Beers and his wife discussed their marital difficulties. Beers then did an errand for his wife. After performing the errand, he returned but could not find her. He then took the children to his home and left them with his daughter. By then, it was early evening. Beers went with a friend to a tavern and spent most of the evening until midnight drinking, visiting, or playing pool, moving from tavern to tavern. When he left the last tavern at about midnight he took with him a six-pack of beer, one can of which he immediately gave to an acquaintance. He then went home, put his .20 gauge double-barrel shotgun in his car, and

began driving about Nebraska City searching for his wife and drinking the beer.

About 3 a.m., Beers saw his wife and a man named Marty getting out of the back of a van and then kissing, after which Mrs. Beers entered a nearby house where she had a room. Shortly thereafter, Beers also entered the house and pulled her from her bed. A fight ensued and he forced her to go with him in search of Marty. They entered a home where Beers expected to find Marty, but the latter was not there, and another fight ensued. During these fights, Beers threatened to kill his wife. His wife fled the house, entered the nearby home of Steve Gruber, and informed the Grubers that her husband was threatening to kill her. Gruber, having no phone, left the house to report the matter to the Nebraska City police. While driving to police headquarters, Gruber observed the defendant driving a vehicle. Gruber continued to police headquarters and reported to White and Rischel, two officers on duty, what Mrs. Beers had told him as well as the fact he had seen Beers.

While Beers was driving about, his vehicle developed a flat tire. He drove to his home, obtained a pickup truck, took the loaded shotgun out of the car and placed it in the pickup, and then continued to search for his wife. He thought she might have gone to the police station and drove past the station by traveling through an alley which lies south of the police station entrance and parking lot. As he drove through the alley, the two officers and Gruber were in the parking lot. The officers were about to enter their patrol car to look for Beers in order to "settle him down." Gruber recognized the Beers pickup as it drove down the alley and he informed the officers. Rischel then shouted to Beers a request or command to stop. Beers heard the command, drove to the street, turned around, came back down the alley, and stopped his pickup in the alley adjacent to

the police station parking lot. Gruber walked toward the pickup and informed Beers the officers just wanted to talk to him. The officers, in the meantime, got out of the patrol car and began to walk toward the pickup by different routes.

Beers got out of the pickup, shotgun in hand, and Gruber warned the officers that Beers had a gun. Rischel directed Beers to put the gun down. Beers instead raised the shotgun and fired, wounding Rischel, immediately turned the gun toward White and fired again, also wounding him. The evidence would permit the jury to infer that, although Beers was unacquainted with the two men, the area was sufficiently well-lighted that he knew they were police officers because he could see the uniforms.

Rischel, although wounded, was able to fire his handgun once, while White was able to fire twice, but all shots missed Beers. Beers retreated to the south of his pickup, ejected the empty shotgun casings, reloaded the shotgun, leaned over the hood of the pickup, and fired one shot which struck the rear window of the patrol car parked near the officers. Beers then fled on foot, borrowed a car from a friend, and began driving. He was arrested at a rest stop on Interstate Highway No. 80 near York early on the morning of July 9, 1977.

White died as a result of his wounds shortly after the shooting. Rischel, although very seriously wounded, survived.

First degree murder includes the killing of a person "purposely and of deliberate and premeditated malice." § 28-401, R. R. S. 1943. The defendant points out that deliberation and premeditation must take place before the killing. Savary v. State, 62 Neb. 166, 87 N. W. 34. He then argues the evidence here is insufficient as a matter of law to show the purpose to kill was formed before the event and urges we so hold. He cites People v. Anderson, 70 Cal. 2d 15, 73 Cal. Rptr. 550, 447 P. 2d 942, in which

the California Supreme Court analyzes the type of evidence which it considers sufficient to support a finding of prior deliberation and argues that in the case before us: (1) There is no evidence of prior planning to kill; (2) there is no evidence to show any motive for killing either of the officers, whom he did not know and with whom he had had no prior contact; and (3) the manner of killing does not show a preconceived design.

The mental process of forming an intent to kill cannot always, of course, be demonstrated by any direct evidence as in Savary v. State, *supra*, where the evidence included prior declarations of intent to kill the victim. However, deliberation and premeditation may be proven circumstantially. State v. Ortiz, 187 Neb. 515, 192 N. W. 2d 151. No particular length of time for premeditation is required, provided the intent to kill is formed before and not merely simultaneously with the act which caused the death. Savary v. State, *supra*; State v. Nokes, 192 Neb. 844, 224 N. W. 2d 776. Motive is not an essential element of murder, although its absence is a circumstance favorable to the accused and the existence of motive may be shown in support of proof of intention. Sharp v. State, 117 Neb. 304, 220 N. W. 292.

In our view, the following combined circumstances which the jury could find from the evidence as fact, either from direct testimony or physical evidence or as reasonable inferences therefrom, justify a conclusion of deliberate and premeditated purpose. The defendant armed himself with a loaded shotgun with the announced purpose of killing his wife. When he drove through the alley the first time, he had the opportunity to observe and admittedly did observe persons in the vicinity of the patrol cars. Their presence was further called to his attention by a command to stop. He recognized two of the persons as police officers. He had time to deliberate while he drove past and then came back. Before Beers got

out of his vehicle, Gruber, whom he knew, approached him and stated that the officers wished to talk to him. Beers immediately got out of the truck carrying the loaded shotgun. Something about his demeanor may have indicated to Gruber that Beers intended to use the weapon, for Gruber shouted a warning and fled. Beers disregarded a command that the weapon be dropped and immediately raised the shotgun and fired, not at Gruber, but first at one officer and immediately at the other. The accuracy of the shots would permit the jury to find the shots were deliberately aimed and not random shots at dim shadows as Beers claimed. After both barrels of the shotgun were empty, Beers deliberately ejected the empty shells, reloaded, and fired again, this time hitting the rear window of the patrol car where a person could have been sitting. From all this, the jury could conclude Beers had formed a preconceived intent to kill.

In the recent case of State v. Johnson, 200 Neb. 760, 266 N. W. 2d 193, a jury found the defendant guilty of murder in the second degree, and it was argued on appeal to this court that the trial court had erred in giving an instruction which would have permitted the jury to find the defendant guilty of murder in the first degree. We held then that circumstances similar to those described above justified an instruction on first degree murder; we now hold the evidence here was sufficient to support the verdict of guilty of murder in the first degree.

Defendant also contends the court erred in permitting Gruber to testify the first shots he heard were those of a shotgun. At the time these shots were fired, Gruber was running for cover. Thus, his back was toward Beers, and the latter was not in his view when the shots were heard. The testimony was of some importance because Beers testified he thought someone had fired a shot at him before he fired. Gruber's testimony therefore corroborated the testi-

mony of Rischel that he was hit by the first shot fired and that Beers fired that shot. Objection was made to Gruber's testimony on the basis of insufficient foundation, in that the foundation testimony did not include evidence Gruber had previously heard and could identify the sound of the discharge of a police .357 magnum "gun." The officers were armed with .357 magnum revolvers.

The foundation testimony which preceded Gruber's opinion included Gruber's testimony that he had used shotguns and was familiar with the sound a shotgun makes; and that, although he had never used a "pistol," he had heard them fired and there was a difference in the sound. He described the first two shots as "roars" and not like a pistol shot. We hold the foundation was sufficient and the trial court did not abuse its discretion in admitting the testimony. The matter the witness was permitted to testify to is not unlike a number of other matters upon which lay witnesses may, depending upon their particular knowledge or experience, and provided the foundation is laid, be permitted to testify to, such as speed, intoxication, identity, nature of a sound, resemblance, and distance.

The applicable rules are: "If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." § 27-701, R. R. S. 1943. Whether the qualifications of a witness with respect to special experience are sufficiently established is a matter resting largely in the discretion of the trial court whose determination is final unless that discretion is clearly abused. Epperson v. Utley, 191 Neb. 413, 215 N. W. 2d 864; Bratt v. Western Air Lines, 155 F. 2d 850, 166 A. L. R. 1061.

Finally, we must determine whether the court

erred in not instructing the jury that it might find the defendant guilty of the lesser-included offense of manslaughter. In order to answer the question, it is necessary to consider the defendant's testimony.

The defendant substantially affirmed the description already given of the events of the afternoon and evening of July 8, 1977, until the point when he left the last tavern. He acknowledged drinking the five cans of beer as he drove about looking for his wife and Marty but stated he was not intoxicated. He related the two encounters with his wife and said his purpose in searching for her and Marty was "to scare her and him." Defendant admitted having told his wife he was going to kill her as well as having told one of the interrogating officers he had told his wife he was going to kill her and her lover boy. However, he stated he had no intention of actually doing so and his only purpose in making the threat was to scare his wife.

Defendant acknowledged transferring the loaded shotgun from his car to his pickup when he changed vehicles because of the flat tire. He testified he did not remember whether he had any shotgun shells other than those in the gun, but if he did he took them with him. However, on cross-examination, he said he had only two or three shells. He stated he drove to the police station because he thought his wife would go there and, as he drove through the alley by the station, he thought he saw four people there and heard someone "holler" at him. He turned around, drove back through the alley, stopped his pickup, got out and, "I asked him if they wanted — if somebody wanted to talk to me." Next, "Somebody shot at me I thought. I heard a shot." When asked why he got out of the pickup with the shotgun in his hand, he said, "I don't know because I didn't intend to use no shotgun, the only reason I had it with me was to scare my wife." He stated he heard no command to drop the gun and did

not see Steve Gruber at all or hear Gruber yell a warning.

When he heard the shot, he raised the gun and fired without raising the gun to his shoulder: "I seen a shadow down that way and I just fired that way." Hearing another shot, he turned and fired the other way and then ran behind the pickup. He does not remember ejecting the empty shells or reloading the gun. After that he ran.

Defendant denied seeing anyone in uniform in the alley. What he saw was "it looked like someone walked out from behind the cars out to the alley, just a shadowy." That is when he heard the shot. He was unacquainted with officers White and Rischel.

On cross-examination, defendant stated he was still in the truck when he asked, " 'Does somebody want to talk to me.' " Then, when someone started to walk out of the alley, he got out of the truck with gun in hand. Defendant said, "They was coming — they came around the cars and out into the alley," toward him. However, he then testified contrarily, "All I seen was one," and pointed out, on a diagram of the scene, where he had seen the person. He did not know where the shot came from and saw no gun or flash. Later, defendant said the shot came from between the cars and he fired at the only individual he saw. It is clear from the context of this testimony that defendant was referring to the first shot he fired. During the cross-examination, it is also made clear that defendant was shooting at a person when he fired the second shot. He denied reloading and firing a third shot.

On the basis of defendant's testimony, the court instructed the jury on the issue of self-defense; and the defendant does not point out any error in that instruction. Defendant also requested an instruction on manslaughter which the court refused to give.

It is the majority rule and the rule in this jurisdiction that, where murder in the first degree is

charged, the court is required to charge without request on such lesser degrees of homicide as the evidence could support. Kraus v. State, 102 Neb. 690, 169 N. W. 3; Bourne v. State, 116 Neb. 141, 216 N. W. 173; State v. Stewart, 197 Neb. 497, 250 N. W. 2d 849. In order for the rule to be applicable in the present case, the record must contain some evidence which would tend to show that the crime was manslaughter rather than murder. See, State v. Tamburano, *ante* p. 703, 271 N. W. 2d 472; Stevenson v. United States, 162 U. S. 313, 16 S. Ct. 839, 40 L. Ed. 980.

Manslaughter is a lesser-included offense in the greater crime of murder and is defined as follows: "Whoever shall unlawfully kill another without malice, either upon a sudden quarrel, or unintentionally, while the slayer is in the commission of some unlawful act, shall be deemed guilty of manslaughter." § 28-403, R. R. S. 1943.

The element which distinguishes first or second degree murder from the type of manslaughter which is usually referred to as voluntary manslaughter is the absence of malice. §§ 28-401, 28-402, 28-403, R. R. S. 1943. Malice denotes that condition of mind which is manifested by the intentional doing of a wrongful act without just cause or excuse. Pembrook v. State, 117 Neb. 759, 222 N. W. 956.

In the case before us, the defendant's theory of defense was that of self-defense. Although he did not testify affirmatively that he fired the shots because he was in fear of his life or of great bodily injury, the implication of his testimony is that, without provocation by him, he was fired upon without warning and that it was necessary for him to shoot in order to protect himself from death or serious injury. If the jurors found this to be true, then he was innocent and it was their duty to acquit him. The question which we must resolve is whether there was some evidence in this case which would indicate that the crime was manslaughter rather than murder.

Only one reasonable construction can be placed on the defendant's own testimony. The record shows when defendant pointed the loaded shotgun and pulled the trigger, he knew he was firing at human beings. The pointing of the gun and the pulling of the trigger was, according to his own testimony, intentional. He did not claim that he intended merely to frighten or that the discharge of the gun was accidental. If his claim of being first fired upon was not true, as the jury by its verdict so found, then he was guilty of either first or second degree murder, depending upon whether the elements of premeditation and deliberation were present. There was nothing whatever in the evidence to indicate there was a sudden quarrel or the shooting was unintended and occurred during the commission of some unlawful act.

In Fields v. State, 125 Neb. 290, 250 N. W. 63, this court had before it a factual situation very like the one we are now considering. There the accused was charged with and convicted of murder in the second degree. On appeal, the claim was made that the trial court erred in not giving an instruction which would have permitted the jury to find the defendant guilty of manslaughter. The case is different from the one before us only in that the defense was different. There the defendant denied he was the person who did the shooting. In answering the contention that the court should have instructed on the issue of manslaughter, we said: ''If . . . the accused pointed the gun at the deceased, or some other person, and purposely fired the gun, then the intent to kill became specific and the elements of the crime of manslaughter would be wholly lacking. This we must conclude from the record to be the mental attitude of the person who fired the fatal shot. Under the statute, one who purposely kills another is guilty of murder. A deadly weapon, intentionally pointed at a human being, which is discharged [without just

cause or excuse], and from a wound inflicted thereby death ensues, the only reasonable inference to be drawn is that such killing was purposely and maliciously done, and if deliberation and premeditation are absent, the crime of murder in the second degree is complete." See, also, Dean v. State, 128 Neb. 466, 259 N. W. 175.

Where the evidence shows without dispute that one charged with murder purposely pointed a loaded gun at another and pulled the trigger and there is no evidence of a sudden quarrel or other condition which might permit a finding that there was an absence of malice, then the court is not required to give an instruction which would permit the jury to render a verdict of manslaughter simply because there is some evidence to support an instruction on legal justification or excuse for the killing.

The trial court did not err in refusing to instruct the jury on manslaughter. The evidence was such that the defendant was either guilty of some degree of murder or was wholly innocent by reason of the justification of self-defense.

AFFIRMED.