## WILLIAM MORRIS V. STATE OF NEBRASKA.

FILED DECEMBER 30, 1922. No. 22490.

1. **Homicide:** CORPUS DELICTI: PROOF. When on a trial for murder the fact of death is established and the state has proved a chain of circumstances sufficient· to convince the jury beyond a reasonable doubt that the death resulted from the criminal acts or agency of defendant, the *corpus delicti* has been sufficiently proved.

2. ———: INFORMATION. In an information for murder, it is not necessary to specify the portion of the body on which a wound is inflicted; the words "upon the body" are a sufficient averment of the location.

3. **Information.** The technical rules of the common law as to informations are relaxed under the provisions of section 10074, Comp. St. 1922. See *Nichols v. State, ante,* p. 335.

4. **Criminal Law:** TRIAL: OPENING STATEMENT. The opening statement of the county ·attorney, as set out in the bill of exceptions, *held* a sufficient compliance with the provisions of section 10144, Comp. St. 1922.

5. **Rulings** on the admission of evidence *held* to fall within the judicial discretion vested in the trial court, and are found free from error.

6. **Instructions.** The rulings of the court on instructions to the jury are approved.

ERROR to the district court for McPherson county: J. LEONARD TEWELL, JUDGE. *Affirmed.*

*J. A. McGraw* and *Beeler, Crosby & Baskins,* for plaintiff in error.

*Clarence A. Davis, Attorney General,* and *Jackson B. Chase, contra.*

Heard before MORRISSEY, C. J., LETTON, ROSE, ALDRICH, DAY and FLANSBURG, JJ., SHEPHERD, District Judge.

MORRISSEY, C. J.

Defendant prosecutes error from a conviction of murder in the second degree under which he was sentenced to the penitentiary for the term of his natural life.

Defendant with his wife and six children resided upon a ranch owned by one Smith in McPherson county. The ranch consisted of a section of land on which was situated a small one-roomed house and meager outbuildings, and another section of land situated a mile distant therefrom. Defendant's father-in-law, a man advanced in years, was temporarily residing with defendant. April 10, 1921, defendant and his wife left their residence for the avowed purpose of gathering up live stock which was in their charge and putting it into the pasture, being the section mentioned as lying a mile west of their home. Defendant rode a bay horse apparently well broken to saddle and his wife rode a gray horse which was young, active and high-spirited, but which had been used to a considerable extent as a saddle horse and which she had theretofore ridden on numerous occasions. Neither returned to their home during the afternoon or evening, but about 1 o'clock on the following morning defendant returned to his home, aroused his father-in-law and informed him that Mrs. Morris had been thrown from her horse in the pasture; that upon being thrown she had become entangled in the lariat rope attached to her saddle; that he had endeavored to catch her horse and free her from the rope but that his efforts had been fruitless. He stated that he had followed his wife and the horse throughout the early hours of the night, until finally, owing to the darkness, he was unable to follow them longer; that he would then take a lantern and return again to the pasture and renew his efforts to rescue his wife. He directed the father-in-law to send one of the children to a neighbor's as soon as it became daylight with the request that the neighbor come and give assistance.

Defendant then departed from his house. He was next seen about daylight when he called at the home of a neighbor living midway between defendant's home and the pasture. Defendant told this neighbor the same story he had related to his father-in-law, with the ad-

dition of certain details. With the coming of morning one of defendant's children was sent for help; a number of neighbors were advised of defendant's story and they went to the designated pasture to render assistance. The first person to arrive was a Mr. Pierce, who upon being informed of the situation went first to defendant's home, but learning that the search for Mrs. Morris was being made in the pasture traveled thence on foot over the road and entered at the gate on the east side of the pasture. He there saw the gray horse which had been ridden the evening before by Mrs. Morris fully saddled with a tie-rope around its neck, but without a bridle, standing close to the east line of fence. Looking westward he saw defendant coming toward him leading his bay saddle horse. When defendant came up the two men caught the gray horse without difficulty. Defendant in reciting the incidents of the evening before stated that while Mrs. Morris was riding the gray horse he appeared to stumble and threw her to the ground; that she arose and, together with defendant, went to a straw stack which was standing in the southwestern part of the pasture; that defendant advised her not to again ride the horse and left her and her horse at the straw stack while he went to drive in some live stock; that when some distance from the stack his attention was attracted that way and he saw that Mrs. Morris had attempted to mount the horse; that she was clinging to his neck and he was running around the stack; that defendant hurried to her assistance; that upon his arrival he found that his wife had fallen from the horse, but that she was entangled in the lariat rope attached to her saddle and was being dragged by her horse; that defendant dismounted and attempted to catch the gray horse; that at one time he succeeded in grabbing the bridle reins, but the bridle broke; that his wife called to him to cut the rope; that he got so close as to take hold of his wife, but could not stop the horse or disentangle her from the rope; that the horse traveled off across the pasture and the de-

fendant followed, but was unable to overtake the horse
or give assistance; that, he thus followed from shortly
after sundown until about midnight when he went to his
home to get a lantern and then returned to the pasture
again. He stated that the horse had dragged the body
of his wife to the north side of the pasture, that is, to
that portion lying north of the road which traversed the
pasture from east to west, and indicated that the search
for her body ought to be made north of this road.

As other neighbors assembled the search for the body
covered the entire pasture, and at 8 o'clock in the morn-
ing her dead body was found on the top of a sandy hill
almost devoid of vegetation close to the southern line of
the pasture. Defendant had complained early in the
morning of sickness and after the body was found the
neighbors suggested that he return to his home. They
procured a conveyance and took the body to the home,
where it was washed by a number of neighbor women.
A messenger was sent to notify the coroner, and in the
afternoon defendant and a neighbor went to town and
arranged with an undertaker for the burial and sent
word of the death to relatives and friends.

Suspicion of uxorcide does not appear to have arisen
until after the funeral when neighbors went to the pas-
ture and examined the trail over which the body had
been dragged. It was found that the trail did not cross
the road which runs across the pasture, but, on the con-
trary, the horse seemed to have started at the straw stack
and remained on the southern half of the pasture. The
tracks also indicated that the horse had walked practi-
cally all the time while dragging the body, and, although
the trail led for the greater part over sandy land scantily
covered with vegetation, no human tracks along the
trail were visible. The suspicions aroused resulted in
the calling of two surgeons to make a *post-mortem* ex-
amination of the body. The testimony of these doctors
shows that the body was mutilated and worn away on
the front of the abdomen, the front of the left thigh, the

breasts and chest, the right side of the face, portions of the elbows, the inner side of the right leg and the thigh. There were discolorations on either side of the neck immediately below the jaw. There was a wound or contusion extending across the right side of the face from the side of the nose across the eye to a point near the ear. This contusion was shallow, but the tissue underneath, between the surface and the bone, was infiltrated with blood. The witnesses testified that this wound was produced by a hard blow. But they did not undertake to designate the weapon used. The witnesses described the discolorations on the neck and stated that they corresponded to the limitations of a human hand; that they were produced by external pressure which, if applied for sufficient time, might have caused the death. And each of these witnesses expressed the opinion that the wound upon the face and the contusions on the neck were *antemortem* in character. The mutilations of the body evidently produced by being dragged over the rough surface of the earth were also described by the state's medical witnesses and scientific reasons given for the conclusion that these wounds or mutilations were produced after the death. No cuts or bruises of any kind were found upon the palms of the hands nor upon the posterior of the body. Each of these witnesses testified that in his opinion the woman was dead at the time the dragging began. To set out the reasons on which the conclusions of these experts are based would serve no useful purpose, but, when read by a layman, they appear conclusive. Although defendant called medical experts to testify, there is no direct contradiction of the state's witnesses or substantial dispute as to the conclusions they reached. The most that can be said is that, according to the experts who testified as witnesses for defendant, the expert witnesses for the state did not make such a thorough and exhaustive autopsy as defendant's witnesses thought necessary in order to enable the state's witnesses to form sound conclusions in regard to the character of the

wounds and the cause of death.    It is the theory of the
state that defendant inflicted the wound upon the face
and the wounds upon the neck heretofore described and
thereby caused the death of his wife; that having taken
her life he attached her dead body to a saddle horse by
means of a rope and dragged it over the prairie for the
purpose of disguising the true cause of death, and to
make it appear that she was thrown from her horse and,
becoming entangled in her lariat rope, was dragged to
death.

Numerous assignments of error are made, but the one
which to us appears most substantial will be dealt with
first, although it is not first in the order of the assign-
ments made.    It is earnestly urged that the proof on be-
half of the state is insufficient to prove the *corpus delicti*.

The term means the body of the offense, the substance
of the crime.    In the instant case it has two component
elements—the fact of death, and the criminal agency of
defendant as to the cause of death.    The fact of death
is shown beyond question.    Was the death occasioned by
the criminal act of defendant?    The last time this
woman was seen alive she was apparently in vigorous
health and was in the company of defendant.    This was
shortly before sundown on the evening of April 10, 1921.
The following morning her dead body was found upon
the prairie.    Prior to the finding of the body defendant
had stated to a number of persons that he saw her in
this pasture clinging to the neck of her horse and later
being dragged behind her horse by a rope which was
entangled about one of her legs; that she called to him
to cut the rope; that he endeavored to rescue her and in
his efforts in that behalf followed her and the horse which
was dragging her, on foot, from about sundown until
nearly midnight.    The trail over which the body was
dragged, when examined soon thereafter by disinterested
witnesses, failed to disclose any human tracks, although
the surface of the earth was not entirely covered with
vegetation.    The soil was sandy and in all human prob-

ability such tracks would have been apparent had de-
fendant followed this horse as he related to his neigh-
bors he had done. When he went to the home of his neigh-
bor, Mr. Buck, and informed him of the alleged accident
to his wife, he stated that in attempting to mount the
horse "she got up with both feet and legs on the same
side of the horse, and the horse gave a buck or two and
throwed her off, and her feet got in the rope." The evi-
dence shows that she was accustomed to outdoor life, to
riding after live stock, and prided herself upon her
ability as a horsewoman. The saddle she used was not
a side-saddle, but the standard cross-saddle such as is
used by men. She was not wearing skirts, but was clad
in overalls, so there was no occasion to take a side seat
upon the saddle, and, when the testimony as to her habits
in riding is considered in connection with the saddle
which is in evidence, a jury might well disbelieve de-
fendant's story as to her having mounted in the manner
he described. This is especially true in view of defend-
ant's statement that shortly before this incident she had
been thrown by this horse. The evidence also shows that
the horse did not travel for any considerable distance at
a gait faster than a walk while dragging this body. The
condition of the body showed also that it did not turn
over during the dragging but was dragged the entire
time face downward. Although the abdomen, the breasts,
one side of the face, the lower side of the arms, as they
were extended beyond the head, were cut, torn and worn
away, the palms of the hands and fingers were un-
scratched.

It is doubtful if this body, either in life or in death,
could be dragged at a high rate of speed, over the rough,
undulating prairie that is described, without turning
over, yet the evidence seems to be conclusive that at no
time was this body upon its back or upon either side. The
conduct of defendant upon the night of the tragedy is at
least peculiar. He is shown to have been an experienced
horseman accustomed to the work in which he and his

wife were engaged. He did not testify as a witness, but he stated to his neighbors that when he saw his wife in trouble he was on horseback and hurried to her assistance. But, in place of remaining upon his horse and riding up to and catching the horse which was dragging his wife, he dismounted. According to this story he abandoned his saddle horse and attempted to do that which to a man of his experience ought to have appeared improbable, if not impossible, of accomplishment, namely, to catch, without the aid of his horse, this frightened, high-spirited, young animal. It is true of course that in the excitement of the moment he might have made an error of judgment and this conduct would not be sufficient to brand his whole story as untrue, but, in addition to this, he appears to have gone home during the night and, in doing so, to have passed by the home of a neighbor without arousing him and calling for help. Although he told some of his neighbors that his saddle horse left him when he dismounted to go to the aid of his wife and that he had traveled on foot, nevertheless the first time he is seen in the morning is at the home of a neighbor, and at that time he had his saddle horse with him. He has never explained when, how, or where he caught this horse. To every neighbor to whom he talked he said that the body had been dragged over the northern part of the pasture, but no trail was found in that part of the pasture. The record fails to disclose the age of either husband or wife, but it shows that they had been married 14 or 15 years; that they were the parents of six children; that the wife lead an active, outdoor life, doing work that ordinarily falls to the lot of the husband; that she was accustomed to ride horses and that she enjoyed riding the gray horse that has been mentioned because of his fine spirit. The testimony indicates that defendant was suffering from some form of stomach trouble and that he was emaciated and under-weight.

As a possible motive for the commission of the crime charged, the state showed that in 1918, while defendant

and his family were residents of Dawson county, complaint had been filed charging defendant with failure to support his family, and that he had been arrested under this complaint but the proof shows that following the filing ·of this complaint these parties lived together as husband and wife and that up to the very day of the tragedy they had been almost constantly in one another's company, and we cannot attach much importance to the difficulties disclosed by the proceedings mentioned. There is, however, other testimony of a more serious character. There is the testimony of a sewing-machine agent, that only a few weeks before the death of the wife he called at defendant's home to make a collection, and that after seeing the wife and securing her promise to make a payment on April 15, 1921, he saw defendant and told him of the wife's promise to make the payment; that during this conversation defendant told the witness that his wife would not make the payment promised, and, in addition thereto, he made remarks, which we refrain from setting out in this opinion, reflecting upon the character of the, wife; accused her of having squandered his money; told the witness he had been tempted to kill her, and said: "I will have to do it yet sometime, and I will guarantee you she will never make that payment on the 15th of April."

By other testimony it is shown that upon several occasions he had made statements seriously reflecting upon the character of his wife and charging her with having wasted his substance. About ten days before the tragedy defendant was in the city of Ogallala and sought a loan from a friend for the avowed purpose of procuring a divorce; the friend advised him to go home and take care of his children, whereupon defendant, in the roughest of language, accused his wife of intimacy with another man. There is other testimony indicating that defendant was jealous of his wife. Whether with, or without, reason is immaterial, but, so far as the record discloses, his jealously was the creature of his own imagination. The

evidence is of such a character that the jury might well have reached the conclusion that this woman did not die as the result of the dragging, but, on the contrary, her death was due to violence criminally inflicted by defendant. The *corpus delicti* is sufficiently established.

The information charged the crime to have been committed by the use of instruments and other means unknown to the county attorney; and that the wounds were inflicted "in and upon the parts of the body" unknown to the county attorney. Defendant filed a motion to quash the information. The motion was overruled, and this ruling is here urged as error. Defendant's contention is that, when the information states, as in this case, that defendant with instruments or weapons and other means unknown to the prosecuting attorney did strike, penetrate and wound the deceased, he could as positively state the parts of the body thus struck, penetrated and wounded. This is generally true, but it is not always so. "And the trend of modern authority is in favor of dispensing with any allegation whatsoever respecting the location of the wound or bruise." 13 R. C. L. 900, sec. 206.

Wharton on Homicide (3d ed.) 859, states the rule to be that it is not necessary to specify the portion of the body on which a wound is inflicted, the words "upon the body" being a sufficient averment of their location.

The technical rules of the common law as to informations are relaxed under the provisions of section 10074, Comp. St. 1922. *Nichols v. State, ante,* p. 335.

Complaint is also made that the county attorney in his opening statement failed to comply with the provisions of section 10144 Comp. St. 1922, in that he did not fully disclose the evidence upon which the state relied for a conviction. The statute contemplates only a brief and general statement of the state's case. The statement of the county attorney is preserved in the bill of exceptions and we are convinced that it fully meets the requirements of the statute.

Exceptions were taken to the admission in evidence of the transcript of the proceedings in Dawson county wherein defendant had been charged with failure to support his family. These proceedings were had nearly three years prior to the death of defendant's wife. It is said that this evidence was too remote, and, in connection with this assignment, exception is taken to the rulings of the court in excluding certain correspondence had between defendant and his wife at or about the time the proceedings were pending. As heretofore remarked, the evidence of this difficulty had little, if any, probative force. The court might well have excluded it, but we cannot say that its failure to do so could work to the prejudice of defendant. The correspondence excluded had no bearing on the case aside from these proceedings. The rulings on these matters, as well as the other rulings on evidence, fall within the judicial discretion vested in the trial court and are free from error.

Criticisms are made of the rulings of the court on its failure to give instructions requested by defendant and for the giving of certain instructions on the court's own motion. These criticisms have been carefully examined, but the court finds that whenever an instruction requested correctly stated the law applicable to the facts its substance was given by the court. And the instructions given on the court's own motion are found to be free from error.

The record shows that the case was carefully tried; that defendant was ably defended; and that there is no prejudicial error in the record. The judgment of the trial court is

AFFIRMED.