STATE OF NEBRASKA, APPELLEE, V. RICKY A. JOHNSON,
APPELLANT.

266 N. W. 2d 193

Filed May 3, 1978. No. 41601.

John R. Brogan and Joseph P. McCluskey, for appellant.

Paul L. Douglas, Attorney General, and Paul W. Snyder, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ.

CLINTON, J.

The defendant Ricky A. Johnson was charged with having, on April 22, 1977, purposely and with deliberate and premeditated malice, killed James M. Richardson, II, an officer of the city of York police department. He was found guilty by a jury of murder in the second degree and was sentenced to a term of 20 years in the Nebraska Penal and Correctional Complex.

He has appealed and makes the following assignments of error: (1) The evidence is insufficient as a matter of law to support the verdict of murder in the second degree, because it will not support a finding that the killing was done purposely and maliciously and therefore the submission of the issue of guilt of murder in the second degree was error. (2) The court erred in permitting the jury to consider the issue of guilt of murder in the first degree. (3) The court erred in receiving in evidence a portion of an out-of-court statement of a prosecution witness, the defendant's mother, offered for the purpose of impeaching the witness, which impeaching statement contained a reference to the fact that the defendant had given alcoholic liquor to a minor and further contained the following: "You will spend a lot more time in jail than you have." (4) Misconduct of the prosecuting attorney in closing argument in attempting to draw conclusions as to the location from which the fatal shot was fired, based upon the testimony of the pathologist who performed the autopsy on the victim's body as to the path of the bullet through the chest of the victim. (5) Refusal of the trial court to receive, in support of the defendant's motion for a new trial, certain affidavits intended to establish prejudice from the argument referred to in assignment (4) and tending to establish that the

argument was ill-founded. (6) The trial court erred in overruling the defendant's plea in abatement, which plea was founded on the premise that the evidence at the preliminary hearing was insufficient to permit the defendant to be bound over for trial. (7) The sentence imposed was excessive. We affirm.

The evidence shows that on April 22, 1977, defendant Ricky A. Johnson, then age 17, and another young man of about the same age spent the hours from about 7:30 p.m. to about 10 p.m., driving about in the vicinity of the city of York, drinking beer. Near the end of their travels they came into the city of York and observed a group of young girls, among whom was the defendant's young sister, age 13, outside a recreation center. The girls were participating in a birthday party for the defendant's sister. The defendant and his companion picked up the group of girls and returned them to the Johnson home. During the trip from the center to the Johnson home, the defendant, who was not driving the car, gave one of the girls a drink of beer. The defendant's sister and other girls were upset by this incident and it came to the attention of the defendant's mother. At about 10:15 p.m. when defendant returned to the Johnson home, his mother admonished him about what he had done. He resented the correction and became very abusive. Blows were exchanged. The defendant then, in a fit of temper, obtained a package of .22 caliber cartridges from a shelf and a .22 caliber rifle from the basement where the group of girls were completing the birthday celebration. Defendant then went outside, loaded the rifle, and fired five shots through the living room window of the Johnson home. At that time Mrs. Johnson was on the telephone, reporting defendant's conduct to his older brother, Dennis. Dennis heard the shots and directed his mother to replace the receiver. Dennis then reported the matter to the police. Mrs. Johnson then observed her son going around the north side of a

church located diagonally across the street west of the Johnson home. This observation was reported to the York police department. Officer Richardson responded to these calls. He approached the church from the north and parked his patrol car adjacent to the curb, facing south near the front church yard. Eyewitnesses in a car passing on an adjacent street observed the police car stop, the officer get out, and, in a crouching position, move toward the front of the car. He was then observed by the witnesses to move back, open the car door and close it, and then, using the same crouching movement, go to the rear of the car, pass behind it, and move toward a sign in the front church yard. One of the witnesses stated that the officer was moving in a southwesterly direction. This projected path would take him toward the south side of the church where the church parking lot was located. As the officer neared the sign the witnesses heard a shot, or pop, and saw the officer fall. They saw no one other than the officer. They then proceeded in their car to the police department to report the matter.

The defendant took the stand on his own behalf. He acknowledged that the gun was in his hands when it discharged and that he was, at the time, on the south side of the church on a sidewalk adjacent to the wall of a section of the church which projected southerly from the main body of the structure. He testified that he did not see the officer before the shot was fired, that the discharge was accidental, and that he had no intention of shooting or killing him. After the shot he heard a coughing sound and he moved forward and observed Richardson's body. About that time defendant observed a second officer approaching in a patrol car and fled. Richardson died within a few minutes. Later that evening the defendant voluntarily surrendered. Additional details of the evidence will be discussed as necessary in connection with the various assignments of error.

The first two assignments of error will be discussed together. Essential elements of the crime of murder in the second degree are that the killing be done purposely and maliciously. § 28-402, R. R. S. 1943. First degree murder contains the additional element of deliberate and premeditated malice. § 28-401, R. R. S. 1943. Where the information charges murder in the first degree, murder in the second degree and manslaughter are included in the charge, and where different conclusions may be drawn from the evidence, the court does not commit error in submitting different degrees under proper instructions for the jury's determination. Jackson v. State, 133 Neb. 786, 277 N. W. 92. If, on a charge of first degree murder, the evidence is sufficient only to sustain a charge of manslaughter, it is reversible error to submit to the jury the issue of guilt of murder in the first or second degree. Clark v. State, 131 Neb. 370, 268 N. W. 87. Malice, in its legal sense, denotes that condition of mind which is manifested by intentionally doing a wrongful act without just cause or excuse. It means any willful or corrupt intention of the mind. McVey v. State, 57 Neb. 471, 77 N. W. 1111.

There were many factors in the evidence from which the jury could find that the killing was done purposely and maliciously and with deliberate and premeditated malice. The following facts, in addition to those already recited, were either shown by undisputed evidence, or permissible inferences from disputed evidence. (1) After the defendant fired the shots through the window of the Johnson home, he loaded the rifle with additional cartridges. This is some evidence of an intention to make further use of the weapon. (2) He had been informed that his mother was going to call the police and he therefore had reason to anticipate their arrival. A friend of the defendant, to whom he talked during his flight, testified that the defendant stated, ". . . old lady said

he [defendant] was drunk and she doesn't care about him and she called the pigs on him." His mother, although professing not to remember the impeaching statements earlier referred to, admitted she may have told him that she was "going to call the police." She did, after the conversation with her son, Dennis, call the police to report where defendant was going after she had observed him moving around the north side of the church. (3) The defendant obtained the ammunition and rifle after he was informed by his mother that she was going to call the police. (4) After the shooting and before his surrender, the defendant made various admissions to friends with whom he spoke. These include: " 'I shot a pig.' " In response to an expression of disbelief by a friend he said, " 'I did.' . . . 'For all I know, he could be dead.' " In the presence of the same friend he kept asking himself, " 'Why?' " Also, " 'I shot him right in the church parking lot.' " He "just didn't know why." And he said, " 'Damn it, why did I do it.' " Also, " 'Will you guys go find a cop for me, I just shot a pig.' " These expressions in the context of the circumstances all tend to show an intentional act. (5) The rifle was a pump action weapon with a tubular magazine having a capacity of 20 short cartridges. When the rifle was turned over to the police it had a live round in the chamber. The friend who retrieved the gun at the defendant's request and turned it over to the police, testified that he did not manipulate the mechanism in any way. This leads to the inference that the defendant deliberately pumped a live shell into the chamber after the shooting and was prepared to use it again. (6) Although the defendant testified that the firing was accidental, he also, at another point in his direct examination, acknowledged that sometime after the shooting he asked himself, " 'Why did I pull the trigger?' " At that time he slammed the weapon to the ground and damaged the stock. (7) The defend-

ant was an experienced hunter of rabbits, squirrels, and crows and he used the rifle for that purpose. He estimated that he had fired 5,000 rounds in hunting and target shooting. He was familiar with the operation of the gun and the use of the safety mechanism thereon. (8) The defendant testified that he did not see officer Richardson before the rifle discharged. However, there is substantial evidence that would permit the jury to find otherwise. The area in front of the church and the parking lot were well lighted by a street light and another similar light at the west edge of the parking lot. While the officer was moving from the rear of the car to the position where he was shot, his movements could have been observed by the defendant for a distance of about 18 feet to just a step or two, all depending upon the exact location of the car with reference to defendant's position and the southeast corner of the church structure which could have obstructed defendant's view. Details of the possible position of the car as it affects the matter of defendant's view of the officer's movements will be dealt with in more detail when we discuss assignments of error (4) and (5). The evidence would also indicate that defendant could have seen the officer when he made his first movement to the front of the parked patrol car. While an accidental, unaimed shot could have struck the officer, all the circumstances would tend to indicate the far greater likelihood of the shot having been aimed. (9) Expert opinion founded upon an examination and tests of the weapon showed that it was in good mechanical condition, that a pressure of $3\frac{1}{4}$ pounds was required to move the safety from the safe position, and that the trigger pull was $6\frac{1}{2}$ pounds. The rifle was accurate and at a distance of 100 feet would fire a grouping 2 inches below the aiming point. It would not fire accidentally with the safety off on a 2-foot drop to the floor.

Even without the testimony of the defendant that

the gun was in his hands when the shot was fired, the State had made a prima facie case before it rested. We mention only one additional thing. Expert testimony established that the bullet which killed officer Richardson was fired from the defendant's rifle.

The evidence was without question sufficient to submit to the jury the issue of guilt of murder in the first degree and murder in the second degree. The jury, probably basing its verdict on the evidence that defendant had, in the 3-hour period preceding the killing, consumed six ordinary size cans of beer and one 25-ounce container of strong lager beer, together with the evidence of his seething anger, found him guilty only of murder in the second degree. It resolved the permissible inference in his favor. It was a proper verdict under the evidence which was sufficient to support a finding beyond a reasonable doubt of either first or second degree murder.

We now examine the claim of error in the admission of testimony of a police officer impeaching the denial of Mrs. Johnson that she had told the defendant that she was going to call the police. The impeaching statement included: " 'You can get into lots more trouble than you've been in giving minors, delinquency to minors, stuff like that,' I said, 'You will spend a lot more time in jail than you have.' " This portion of the statement, of course, was immaterial to the impeachment and should not have been admitted for it tended to show that the defendant had been in jail previously and therefore implied possible guilt on some sort of charge. No objection was made to the statement when first offered. However, counsel did shortly thereafter move for a mistrial, which motion the court denied and did then admonish the jury to disregard the statement.

The defendant relies upon our holdings in State v. Atwater, 193 Neb. 563, 228 N. W. 2d 274; and Balis v. State, 137 Neb. 835, 291 N. W. 477. In the first cited case we reversed and remanded for a new trial,

even though we regarded the evidence of guilt in that case as conclusive. It appears that there we were imposing a sanction because of the deliberate injection of the evidence which the prosecutor knew was inadmissible. That is not this case. Here the offending evidence was a portion of a longer statement which was properly received in laying the foundation for later impeachment.

The offending portion does not necessarily show that the defendant was guilty of a previous offense. Even insofar as it does imply possible guilt, the whole statement indicates that it would have been for a minor offense, i.e., something less than giving a minor an alcoholic beverage, which latter offense is, as is rather common knowledge, normally punishable only by a fine.

The record further shows that one of the officers to whom Mrs. Johnson made a statement about her altercation and conversation with the defendant prior to the shooting, made a written record of the questions and answers and this was signed by Mrs. Johnson. Defendant's counsel had been furnished with a copy of that document before trial. The impeaching statement and the matter on which the motion for mistrial were founded were both included in the same answer. It was therefore to be anticipated that the entire answer would be included in laying the foundation for impeachment in the course of a preliminary inquiry to the witness as to whether or not she had made the statement. Problems such as this could well have been anticipated by both the prosecutor and the defense counsel before trial and the matter resolved before a question such as this arose.

The critical issue in the case before us was the defendant's intention and his state of mind. When one considers the entire record, it is impossible to conclude that the jury would have founded its determination of that issue upon the fact that the defendant

may have been in jail on some minor charge. In the two cases relied upon by the defendant, the evidence of other crimes was of serious crimes of the identical nature of those on which the defendant was being tried, to wit, robbery and forgery, respectively. We conclude that, beyond any reasonable doubt, there was no prejudicial error requiring reversal and retrial.

We now turn to assignments (4) and (5) pertaining to alleged misconduct of the prosecutor in final argument to the jury. The defense advanced by defendant is that the rifle accidentally discharged as he was stumbling (apparently because of his intoxicated condition), along the west wall of the church at the point near the corner of the ell, apparently while carrying the gun in his right hand and supporting himself with his left. To bolster the position of lack of deliberation, he asserted in final argument that he could not have seen officer Richardson until the very moment the gun discharged because until that moment officer Richardson was hidden from view by the southwest corner of the building. The premise for that claim rested largely upon the assumed path that officer Richardson would have followed in moving from the rear of the patrol car to the point where he was shot. The testimony of various witnesses put the patrol car in different positions along the curb in front of the church. In the most northerly of these positions officer Richardson's movement could not have been seen by the defendant from the position he claimed to be in when the gun discharged except for the last step or two. If the car were further south in the approximate location fixed by other witnesses, then the defendant might have observed the officer's movement during a space of 15 to 20 feet before the shot was fired.

Shoe prints similar to prints made by the shoes of the defendant at the time of the shooting were found near points where the defendant said he was as well

as a considerable distance southerly away from the church and near the west edge of the parking lot.

The testimony of the pathologist who performed the autopsy, who had some practical experience in forensic medicine, together with the diagrams which he prepared show that the bullet entered the victim's upper left chest in the space between the first and second ribs and followed a straight path to the right and downward, passing through the left lung, the aorta just above the heart (the fatal wound), the lower right lung, and then struck the ninth rib (right) and then was deflected upward, coming to rest in the flesh adjacent to the seventh rib. The bullet, after being retrieved from the body, was only slightly deformed at the nose. As already noted, the eyewitnesses stated that officer Richardson was moving in a low crouch. This would account for the downward path of the bullet through the chest. The prosecutor, in final argument in response to defense counsel's argument that the defendant did not see the victim until after the shooting, argued that the path of the bullet through the victim's body from left to right supported the proposition that the shot may have been fired from a position along the north edge of the parking lot from a position more westerly than the location the defendant testified he was in when the shot was fired. If the defendant was in that position he could have seen the officer's movement from the rear of the car to the point where he was shot even though the car was in the most northerly position fixed by an eyewitness.

The defense relies upon the following proposition: ''The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.'' American Bar Association Standards Relating to the Prosecution Function, § 5.8 (a). The defense, in an attempt to demonstrate

that the prosecution's inferences from the evidence were not reasonable ones, makes three points: (1) There is no direct evidence to challenge the defendant's statement as to where he was when the bullet was fired; (2) the affidavit of the pathologist, offered by the defendant in support of his motion for a new trial, stated that the affiant did not determine from the path of the bullet through the body the trajectory of the bullet before it struck the victim and that his testimony at trial did not relate to that point; and (3) the affidavit of a retired member of the Nebraska State Patrol, who had been head of its criminal division and who had considerable experience in ballistics and firearms identification and which was also offered in evidence in support of the motion for new trial, was to the effect that the path of the bullet after it enters the body can give no reliable indication of the prior trajectory of the bullet.

The pathologist's affidavit does not exclude the possibility that the general trajectory may be determined if the exact position of the body is known at the time of impact. The affidavit of the retired ballistics expert contains the qualification, "unless the exact position of the victim's body at the time the bullet struck the body is known."

We believe the evidence supports the conclusion that until the bullet struck the ninth rib it hit no substance which would materially change its path. The only possible explanation of the downward path of the bullet through the chest is the fact, supported by evidence, that the victim was moving in a crouch at the time he was struck and that the upper part of his body formed an acute angle to the horizontal and with the trajectory of the bullet which was fired from a distance of 85 feet during which time its trajectory would be relatively flat.

Similar arguments support conclusions as to the direction from which the bullet came. No one knows the exact position the victim was facing at the

moment the bullet was fired. If he was moving southwesterly, as the eyewitnesses testified and as he would have been if the patrol car was in the estimated northerly most position and if the defendant was standing where he claimed, then the path of the bullet would have been from right to left, rather than left to right. If, on the other hand, the car was in one of the southerly estimated positions and the officer moved in a straight line from the rear of the car to the position where he was shot, he may have been turned somewhat sideways to the defendant's claimed position and the bullet would have followed a path from left to right, as was found by the autopsy. If he was moving south and facing southwesterly, then the bullet would have to have been fired from a more northerly position, perhaps from the westerly edge of the parking lot.

The arguments of the prosecutor were clearly not illogical, did not misstate any evidence, and were not contrary to reasonable conclusions which could be drawn from the evidence.

The defendant's counsel claims he could not have anticipated that the prosecutor would make argument on the above points because he was told by the pathologist before trial that the pathologist could not express an opinion on the bullet's trajectory before it struck the body. That fact obviously does not mean that the argument could not be made from the facts which were admitted.

We hold that the prosecutor's final argument did not constitute misconduct and the court did not err in not granting a new trial based upon the contents of the two affidavits.

The defendant's sixth assignment pertaining to the overruling of his plea in abatement is governed by our holding in State v. Franklin, 194 Neb. 630, 234 N. W. 2d 610, and is without merit.

The claim that the sentence is excessive is without merit. Although the defendant has no significant

criminal history, the seriousness of the offense and the circumstances surrounding it would not justify a lesser sentence.

AFFIRMED.