STATE OF NEBRASKA, APPELLEE, V. RONALD G. PAYNE,
APPELLANT.

289 N. W. 2d 173

Filed February 12, 1980.   No. 42691.

William G. Line of Kerrigan, Line, Martin & Hanson, for appellant.

Paul L. Douglas, Attorney General, and G. Roderic Anderson, for appellee.

Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

BRODKEY, J.

Ronald G. Payne appeals to this court from his conviction by the jury of first degree murder of Franklin L. Bowersox, Jr., and from his sentence to life imprisonment following his conviction. He alleges as grounds for reversal (1) that the evidence is insufficient to sustain his conviction for first degree murder; (2) that the trial court erred in failing to sustain defendant's motion for a new trial; (3) that the trial court erred in failing to give defendant's requested instruction with reference to the testimony of persons granted immunity from prosecution for the same crime; and (4) that the court erred in failing to instruct on its own motion on the lesser-included offenses of murder in the second degree and manslaughter. We reverse and remand for a new trial.

Some of the evidence in this case is disputed while other evidence is undisputed. Likewise, while some of the evidence adduced at the trial was direct evidence, a considerable amount of the evidence was circumstantial in nature. Also, while the defendant himself did not testify in his trial, testimony as to certain admissions made by the defendant were testified to by other witnesses.

We first review the facts of this case as revealed

by the record, and the testimony of the witnesses who testified at the trial. The testimony is undisputed that Gerald F. Ranslem (Ranslem) and the victim, Bowersox, were the occupants of a trailer house located in a trailer court near Fremont, Nebraska. Ranslem had moved into the trailer on April 4, 1976, the day preceding the death of Bowersox. Ranslem's testimony was in essence as follows. He and Bowersox retired to their respective bedrooms in the trailer at about 11:30 p.m., on April 4, 1976. Because of the fact that Bowersox had been engaged in the purchase and sale of drugs, it was his custom to lock the doors to the trailer at night as a security precaution. That evening Bowersox took extra precautions, loading "every gun in the house." Defendant Payne lived in the same trailer court and had a key to the trailer, as he had been engaged by Bowersox as a "security guard." Ranslem testified that although he was a very heavy sleeper, he was awakened by a noise during the night, but thought it was just the furnace kicking on or off. He also heard his dog growl.

Ranslem testified he was awakened shortly before 7 the next morning, April 5, by a telephone call from Payne, who told him that he was looking for some books and wanted Ranslem to wake up Bowersox to see if they could find them. Ranslem yelled at Bowersox from the hallway of the trailer but received no response. He returned to the telephone and told Payne that Bowersox wouldn't get up. Ranslem then went back to bed but was again awakened approximately 15 minutes later, this time by someone pounding at the front door. He got up, went to the door, and found Payne outside. Payne was still looking for the books he had called about earlier. Ranslem let him in, and both of them began to search for the books. After looking through other parts of the trailer, Ranslem went down the hallway toward Bowersox' bedroom, followed by Payne.

Ranslem went into the bedroom and began looking on the floor around the bed. While Ranslem was thus engaged, Payne, who was standing in the doorway, said "Frank's [Bowersox] been shot." Ranslem testified that he did not believe Payne could have seen the wound or blood on Bowersox from Payne's position in the doorway. When Ranslem first discovered Bowersox' body in the bed, "the covers were pulled up right to his neck. They covered his hands and everything." There was blood on the pillow, which was not visible to Ranslem when he walked into the room because of the positioning of the covers. Ranslem pulled down the covers and saw the blood about Bowersox' face for the first time, and then checked his arm for a pulse. At that time Payne called an ambulance and then went to his own trailer to inform his wife as to what occurred, but returned before the arrival of the rescue squad. In answer to a question put to him, Ranslem testified he did not kill Frank Bowersox, nor did he participate in any plan to do so.

The body of Bowersox was examined by a pathologist, Dr. Jerry W. Jones. He testified that in his opinion Bowersox had died as a result of a gunshot wound to the head, the gun having been discharged from within 2 feet of his face. The bullet, which eventually lodged in Bowersox' brain and was recovered by Dr. Jones, entered through the nose. He testified that the path of the bullet was in an upward direction from front to back and the bullet itself penetrated the front part of the skull. He testified that once a bullet has penetrated the skull itself it can ricochet and go from one aspect to another so the slug itself is just in the brain substance.

The weapon which fired the fatal bullet was never identified or found. A police investigator performed a nitrate swab test on the defendant Payne; and he understood the results were negative and did not indicate that Payne had fired a gun, although the offi-

cer had not seen the official report himself. However, Payne told the investigator that he had washed his hands before the test was given, which could have affected the results of the test. The investigator further testified that although the bedroom in which Bowersox was found was extremely cluttered, he observed no evidence of a struggle.

Another witness for the State, Jimmy Price, testified that he and Bowersox had been good friends and had dealt in drugs together and, in fact, he had previously lived with Bowersox in the trailer in which Bowersox was living at the time he died. He was asked: "Q- Did you ever know of any problem between Ron Payne or ill feeling between Ron Payne and Franklin Bowersox? A- Yes. Q.- Describe that for us, please? A- Well, he - Ron Payne told me that he was more or less upset with Frank and didn't want him around any more. Q- Do you know why that was? A- No, not for sure." Price further testified that Ron Payne had called him on the telephone a few days before Bowersox' body was found, during which conversation Payne told Price that he had taken from Bowersox' trailer a record book of drug sales and some money which was kept in a box in the vent in the bedroom. Price testified that at that time he told Payne to "put them back, that Frank was going to find out and that he was going to get really mad." He further testified that Payne called him again on the telephone at about 3 or 4 o'clock in the morning on Monday, April 5, 1976, which was the morning that Bowersox' body was found, and said, "it is done." Price then asked Payne whether he had put the book back, but received no response. Price then asked Payne: "[I]s Frank [Bowersox] dead?" Payne answered: "Uh-huh." Price then asked Payne: "[W]hat about Jerry [Ranslem]?" and Payne replied: "[H]e never stirred." Price further testified as to the conclusion of the conversation at that time as follows: "The content of the

conversation he said that I didn't know anything. That I shouldn't say anything if I wanted things to be the way that they were. If I didn't want anything to happen to my fiancee, I didn't want to get arrested for selling drugs, this type of thing." Price also testified that he did not kill Bowersox, nor was he involved in any conspiracy with anyone to do so. Payne also told Price not to take a polygraph test that Price was scheduled to take in connection with Bowersox' death, and Price testified as follows: "He said that if I liked my wife the way that she was, if I liked the things the way that they were and I didn't know enough to convict anybody or anything. * * * That is the content, I knew what he meant." Payne told him at that time he (Payne) wouldn't be convicted anyway and that if he was convicted he wouldn't go to jail; that he had a mental problem of some kind and he would just be committed to some place for observation or help or something. Price admitted that Payne had never told him he killed or planned to kill Bowersox but that he (Price) had gotten that impression, and his delay in telling his story was because he was afraid that if he told it something would happen to himself or to his wife.

Price also testified that his (Price's) Arizona connection for the purchase of drugs was in Lincoln the day they found Bowersox' body, but that Bowersox was not involved in the Arizona drug deal.

Special comment must be made with reference to the testimony given by the State's witness, Michael A. Fetters, of Des Moines, Iowa. He testified that Payne had moved into the apartment next to his in April 1978 and the two became friends. Fetters had given a statement to the Dodge County sheriff's department on January 23, 1979, with reference to certain conversations Payne had had with him with reference to the Bowersox matter; he also had given a deposition with reference thereto, in the presence of the attorneys for both the State and the defendant,

on February 27, 1979. In his testimony given at the trial, Fetters was examined at great length with reference to those statements by the attorney for the State, and was also cross-examined by the attorney for the defense in great detail. The statement and deposition in question do not appear in the record of this case; however, in the examination of Fetters, frequent references occur with regard to statements and testimony allegedly made by Fetters in both of those documents. Some of the statements allegedly made by Fetters were denied by him at the trial, or denied and subsequently reaffirmed. Other statements were uncontested. On appeal to this court, counsel for defendant seeks to limit the degree of consideration of Fetters' evidence under the rule established in Wilson v. State, 170 Neb. 494, 103 N. W. 2d 258 (1960), to the effect that proof of contradictory statements of a witness is received not as evidence of the facts declared, unless made against interest by one who is a party to the record, but for the purpose only of aiding the jury in estimating the credibility of the witness. The same rule was reaffirmed in State v. Price, 202 Neb. 308, 275 N. W. 2d 82 (1979), in connection with section 27-607, R. R. S. 1943, the new Nebraska Evidence Rules. We point out, however, that in instructing the jury the trial court stated: "You have heard testimony concerning statements allegedly made by witnesses prior to this trial which may be inconsistent with their testimony at this trial. This testimony has been admitted solely for impeachment purposes to aid you in estimating the credibility of the witnesses and to determine the weight to be given to their testimony. You may consider it for that limited purpose only and not as evidence of the facts declared in the prior statements."

In any event, it appears that in his statement to the police and deposition, given prior to trial, Fetters had testified that Payne had talked to him about the Fremont matter and had told him that he had

found a body in a trailer court, and basically that "it was just drug related." Payne had told him that the story he had given the police, that he had gone into the bedroom and found Bowersox dead, didn't happen that way; that Frank (Bowersox) said he was a distributor and had something that Ron (Payne) wanted; that Payne had told him he had "chucked" the gun after the shooting; and that Frank Bowersox "had it coming." In his statements Fetters also apparently stated that Payne had told him he had planned or had done the intelligence work on the Bowersox murder and had "bragged that he planned most of it when Carolyn was present," that he had made sure she was there to listen to it, and that this occurred in the kitchen at the table. As a result of examination by the attorney for the State during the trial and cross-examination by attorney for the defendant, it is clear that at least some of Fetters' testimony is contradictory and inconsistent, and subject to retractions and explanations on the part of Fetters. In addition, Fetters admitted on cross-examination that Payne never told him that he had killed anybody or that he had planned any killing. At the conclusion of his direct testimony, he was asked: "I understand that. But when refreshed with the statements of January 23, 1979 and when they are read back do you recall those questions and those answers?" Fetters replied: "Yes, sir, I do." He was then asked if those were substantially the questions and answers that were taken from him and whether they represented the truth to the best of his knowledge. He replied: "To the best of my knowledge." In effect, this was a blanket reaffirmance of the matters contained in his statement to the sheriff's office and his deposition, notwithstanding he had denied under oath that some of his alleged statements were true and had questioned the acccuracy of others. In any event, the jury heard the testimony of Fetters at the trial and, as in-

structed by the trial court, presumably considered his testimony only for the purpose of determining his credibility, and not as substantive evidence of the crime itself.

The defendant was charged and convicted by the jury of the offense of murder in the first degree. The instructions of the court, after hearing the evidence outlined above, covered murder in the first degree only, and did not include murder in the second degree or manslaughter, which are lesser-included offenses under a murder in the first degree homicide charge. The statutes in effect at the time of the events involved in this case, which were prior to January 1, 1979, the effective date of the new Criminal Code, provided: "Whoever shall purposely and of deliberate and premeditated malice * * * kill another * * * shall be deemed guilty of murder in the first degree, * * *." § 28-401, R. R. S. 1943. Murder in the second degree is defined in those statutes as follows: "Whoever shall purposely and maliciously, but without deliberation and premeditation, kill another * * * shall be deemed guilty of murder in the second degree; * * *." § 28-402, R. R. S. 1943. Manslaughter is defined in the following terms: "Whoever shall unlawfully kill another without malice, either upon a sudden quarrel, or unintentionally, while the slayer is in the commission of some unlawful act, shall be deemed guilty of manslaughter; * * *." § 28-403, R. R. S. 1943. It is clear that under the foregoing statutes, a person commits murder in the first degree if he kills another person purposely and with deliberate and premeditated malice (ignoring for the moment certain felony homicides provided for in the statute). Murder in the second degree is distinguished from murder in the first degree only in the absence of the requirement of deliberation and premeditation; but malice and the purpose to kill are the essential elements of murder in the second degree. The lowest degree of homicide, to

wit, manslaughter, is committed by the killing of another without malice, either upon a sudden quarrel or an unintentional killing while the slayer is in the commission of some unlawful act. The principal questions involved in this appeal are whether the evidence, as set out above, was sufficient to support the conviction of the defendant of first degree murder and also whether it was of such a nature as to require the submission to the jury of the lesser-included offenses of murder in the second degree and manslaughter, or either of them. This determination necessarily involves a consideration of our rulings with reference to the sufficiency of circumstantial evidence to sustain a conviction in homicide cases, particularly in view of the fact that a substantial amount of the evidence of this case is circumstantial in nature. We also keep in mind our frequently announced rule that circumstances capable of an innocent construction may be interpreted in the light of the defendant's admissions, and the fact under investigation be thus given a criminal aspect. Vanderheiden v. State, 156 Neb. 735, 57 N. W. 2d 761 (1953); Egbert v. State, 113 Neb. 790, 205 N. W. 252 (1925).

Although there is more than circumstantial evidence present in this case, the law is well settled that a person charged with a crime may be convicted on circumstantial evidence only. State v. Meadows, 203 Neb. 197, 277 N. W. 2d 707 (1979); State v. Ohler, 178 Neb. 596, 134 N. W. 2d 265 (1965). We have also held that an essential element of a crime may be proved solely by circumstantial evidence. State v. Addison, 196 Neb. 768, 246 N. W. 2d 213 (1976). In this connection we have held that deliberation and premeditation in a first degree murder case may be proven circumstantially. State v. Beers, 201 Neb. 714, 271 N. W. 2d 842 (1978). In State v. Casper, 192 Neb. 120, 219 N. W. 2d 226 (1974), we held that in a prosecution for homicide the State may show by circumstantial evidence the cause of

death was a criminal act of the defendant. Circumstantial evidence may also be used to establish the *corpus delicti* of the crime. In Morris v. State, 109 Neb. 412, 191 N. W. 717 (1922), we held that when on a trial for murder the fact of death is established and the State has proved a chain of circumstances sufficient to convince the jury beyond a reasonable doubt that the death resulted from the criminal acts or agency of defendant, the *corpus delicti* has been sufficiently proved. See, also, Reyes v. State, 151 Neb. 636, 38 N. W. 2d 539 (1949).

We next consider the question of the test to be applied in determining the sufficiency of circumstantial evidence in a criminal prosecution. We have stated the rule in various ways. Our most frequent statement of the rule is that to justify a conviction on circumstantial evidence, it is necessary that the facts and circumstances essential to the conclusion sought must be proved by competent evidence beyond a reasonable doubt, and, when taken together, must be of such a character as to be consistent with each other and with the hypothesis sought to be established thereby *and inconsistent with any reasonable hypothesis of innocence.*" (Emphasis supplied.) See, for example, State v. Klutts, 204 Neb. 616, 284 N. W. 2d 415 (1979); State v. Journey, 201 Neb. 607, 271 N. W. 2d 320 (1978); State v. Peery, 199 Neb. 656, 261 N. W. 2d 95 (1977); Reyes v. State, *supra*; NJI 14.50. However, we have also stated the rule to be that the test of the sufficiency of circumstantial evidence in a criminal prosecution is whether the facts and circumstances tending to connect the accused with the crime charged are of such a conclusive nature as to exclude to a *moral certainty* every rational hypothesis except that of guilt. (Emphasis supplied.) See, for example, State v. Costanzo, 203 Neb. 586, 279 N. W. 2d 404 (1979); State v. Classen, 202 Neb. 324, 275 N. W. 2d 91 (1979); State v. Whitney, 202 Neb. 149, 274 N. W. 2d 165 (1979); State v. Bartlett, 194 Neb.

502, 233 N. W. 2d 904 (1975). In Black's Law Dictionary (5th Ed., 1979), the term "moral certainty" is defined as follows: "That degree of assurance which induces a man of sound mind to act, without doubt, upon the conclusions to which it leads. A high degree of impression of the truth of a fact, falling short of absolute certainty, but sufficient to justify a verdict of guilty, even in a capital case. Such signifies a probability sufficiently strong to justify action on it; a very high degree of probability, although not demonstrable, as a certainty. It has also been used as indicating a conclusion of the mind established beyond a reasonable doubt." We have also stated the rule to be that a conviction may rest upon circumstantial evidence if it is substantial. See, for example, State v. Morosin, 200 Neb. 62, 262 N. W. 2d 194 (1978); State v. Davis, 198 Neb. 823, 255 N. W. 2d 434 (1977); State v. Von Suggs, 196 Neb. 757, 246 N. W. 2d 206 (1976).

Notwithstanding the various ways in which this court has stated the rule with reference to the use of circumstantial evidence in criminal prosecutions, we believe they are substantially similar and, in fact, amount to a requirement that the conviction be beyond a reasonable doubt. In State v. Shook, 224 N. C. 728, 32 S. E. 2d 329 (1944), the Supreme Court of North Carolina stated: "Obviously, however apt the expression may be as applied to circumstantial evidence, the exclusion of every reasonable hypothesis of innocence is the equivalent of conviction beyond a reasonable doubt, involves the same mental processes, and results in the same psychological state to which we sometimes refer as satisfaction to a moral certainty." Likewise, in the very ancient case of Commonwealth v. Costley, 118 Mass. 1 (1875), the Supreme Judicial Court of Massachusetts held that "moral certainty" and "proof beyond a reasonable doubt" are synonymous terms, signifying such proof as precludes every reasonable hy-

pothesis except that in support of which the evidence is offered; and no exception lies in a capital case to a refusal to use the term "moral certainty," if an equivalent expression is used. We therefore conclude that if circumstantial evidence is used to convict a defendant in a criminal case, it must be of such weight and character as to establish proof of guilt beyond a reasonable doubt. See, also, United States v. Cortez, 521 F. 2d 1 (5th Cir., 1975).

We first consider defendant's contention that the evidence in this case was insufficient to establish the *corpus delicti* of the crime. We disagree. The *corpus delicti* of the crime of homicide is not established until it is proved that a human being is dead, and that the death occurred as the result of the criminal agency of another. The *corpus delicti* is the body or substance of the crime, the fact that the crime has been committed without regard to the identity of the person committing it. See, Reyes v. State, 151 Neb. 636, 38 N. W. 2d 539 (1949); Gallegos v. State, 152 Neb. 831, 43 N. W. 2d 1 (1950). In Cryderman v. State, 101 Neb. 85, 161 N. W. 1045 (1917), we held that if the evidence other than an extrajudicial confession of the defendant establishes that the human being alleged has been killed by violence not self-inflicted, the *corpus delicti* is proved. It is clear from the evidence in the record that the victim, Bowersox, was killed by a bullet shot from a gun into his nose and found in his brain. The murder weapon was not found, but his position in the bed with his arms crossed and the covers drawn up to his neck would seem to rule out the possibility of accident or suicide. At least the jury could so find from the evidence.

Likewise, even disregarding the testimony of the witness Fetters, we believe there is clearly sufficient evidence in the record from which the jury could find beyond a reasonable doubt that Payne was guilty of murder in the first degree. Without

reviewing in detail all the testimony previously recited, the evidence reveals there was ill feeling between Payne and Bowersox, and that Payne had a key to Bowersox' trailer. Payne told Price that he had taken a record book of drug sales and some money from Bowersox' trailer and was advised by Price to put them back. At a subsequent conversation on the telephone, at 4 o'clock in the morning of the day Bowersox' body was found, Payne told Price "it is done" and when Price asked the defendant whether Bowersox was dead, Payne said "uh-huh". Price then asked Payne about Ranslem, the occupant of the other bedroom in the trailer, and Payne replied "he never stirred." Payne also threatened Price with harm to himself and his fiancee if he said anything about the matter. The above evidence clearly indicates that Payne knew Bowersox was dead as early as 4 o'clock in the morning. He called Ranslem on the telephone shortly before 7 o'clock that morning and told him to wake up Bowersox. He did not tell Ranslem, so far as the record reveals, that he knew Bowersox was dead at that time. Approximately 15 minutes later, he personally came to the trailer for the avowed purpose of searching for certain books he had previously told Ranslem about over the telephone, but he did not mention at that time that he knew Bowersox was dead. When Ranslem entered Bowersox' bedroom, purportedly to continue the search for the books in question, Payne announced to Ranslem that "Frank's been shot," from a position in the doorway from which, according to the testimony of Ranslem, it was unlikely Payne could have seen the wound or blood on Bowersox. While not conclusive of first degree murder, the evidence in the record, both direct and circumstantial, was clearly sufficient to justify the jury in finding beyond a reasonable doubt that Payne killed Bowersox and that the killing was done with deliberate and premeditated malice, even disre-

garding the testimony of the witness Fetters.

The more serious question in this case, however, is whether the jury should have had the opportunity to consider the evidence, under proper instructions, as to the lesser degrees of homicide, to wit, murder in the second degree and manslaughter, or one of them. The court did not instruct the jury on these lesser degrees, and, so far as the record discloses, the jurors may not have even known there were lesser degrees of homicide. The defendant contends that the trial court had the duty to instruct upon these lesser degrees of homicide, even though not requested so to do by him. We now examine that contention.

The applicable statute is section 29-2027, R. R. S. 1943, which provides as follows: "In all trials for murder the jury before whom such trial is had, if they find the prisoner guilty thereof, shall ascertain in their verdict whether it be murder in the first or second degree, or manslaughter; * * *." Our most recent statement of the rule, however, is found in State v. Beers, 201 Neb. 714, 271 N. W. 2d 842 (1978), in which we stated as follows: "It is the majority rule and the rule in this jurisdiction that, where murder in the first degree is charged, the court is required to charge *without request* on such lesser degrees of homicide as the evidence could support. Kraus v. State, 102 Neb. 690, 169 N. W. 3; Bourne v. State, 116 Neb. 141, 216 N. W. 173; State v. Stewart, 197 Neb. 497, 250 N. W. 2d 849." (Emphasis supplied.) In that case we also held that in order for the rule to be applicable the record must contain some evidence which would tend to show that the crime was of a lesser degree than the homicide charged.

With the above rules in mind, we now examine the record to determine whether the facts and circumstances testified to were such as to require the submission to the jury of one or both of the lesser-

included offenses of homicide. We first examine the lesser-included degree of manslaughter. Under the statute, previously quoted, to constitute manslaughter, the killing must have been done either upon a sudden quarrel or unintentionally while the slayer was in the commission of some unlawful act. A review of the evidence convinces us that a charge upon the crime of manslaughter was not required. The testimony in the record given by the pathologist, and which was uncontroverted, establishes clearly that the killing was done by a slug or bullet fired at close range into the nose of the victim. The placement of the shot would clearly indicate that the killing was intentional. Likewise, there is no evidence of any sudden quarrel. A peace officer testified that he saw no evidence of a struggle. Likewise, Ranslem, who occupied the other bedroom in the trailer, would have undoubtedly heard a struggle, had there been one, as the record discloses he heard his dog growl and also apparently heard the furnace kicking on and off. Similarly, there is no affirmative evidence in the record indicating that the killing was done as the result of an unlawful act. That being so, the crime of manslaughter was not committed, and the court was not required to instruct on the elements of that offense.

The question of the duty of the court to instruct on murder in the second degree, however, presents a different problem. The crime of murder in the second degree is distinguished from murder in the first degree by the absence of deliberation and premeditation. See, § 28-402, R. R. S. 1943; State v. Johnson, 200 Neb. 760, 266 N. W. 2d 193 (1978); State v. Partee, 199 Neb. 305, 258 N. W. 2d 634 (1977). In this case, had the jury been instructed on the elements of murder in the second degree, upon a consideration of the evidence in this case, they may well have found that there was a lack of deliberation and premeditation. While the defendant was convicted of murder in the

first degree, it was not required that the jury convict him of this higher offense, even if warranted by the evidence, had they also been properly instructed upon the elements of murder in the second degree. In Russell v. State, 66 Neb. 497, 92 N. W. 751 (1902), there was evidence upon which there might have been a conviction of murder in the first degree, but the jury convicted the defendant of murder in the second degree. In that case the court held that upon the trial of an offense consisting of different degrees, the jury may acquit the defendant of the degree charged and convict him of any of the inferior degrees. In this case, the element of deliberation and premeditation was established largely through the use of circumstantial evidence. We think the evidence in the record is also susceptible of interpretation that the killing was done without premeditation and malice on the part of Payne. For example, the evidence reflects that Payne told Price that he (Payne) had taken records of dope transactions and money from Bowersox' trailer. Price told Payne that he had better put them back as Bowersox would be angry if he found out. At a subsequent telephone conversation, Payne told Price "it is done," which expression is susceptible to interpretation, either that Payne had killed Bowersox or that Payne had replaced the records and money. As a factual statement it was for the jury to decide which interpretation they wished to place upon it. In any event, the jury might have concluded that Payne was surprised by Bowersox while replacing the records and had killed Bowersox at that time without premeditation or planning in advance. We conclude that under the aforementioned rules of law and the evidence and circumstances revealed in the record, the trial court should have instructed the jury on both first and second degree murder, and that its failure to do so was reversible error, necessitating a remand for a new trial.

We also wish to briefly comment on defendant's claim that the court erred in failing to give an instruction requested by defendant that testimony of persons granted immunity from prosecution for the same crime for which defendant was being tried should be received with care and caution. The record reveals that both Ranslem and Price were granted immunity from prosecution for the same crime in return for their testimony at the trial. Both parties so testified at the beginning of their testimony in response to questions by the attorney for the State. We have approved an instruction similar to that requested by the defendant, being NJI 14.58, to the effect: "The state has adduced testimony from a claimed accomplice. His testimony should be closely scrutinized for any possible motives for falsification, * * *." The defendant also relies on two cases in support of his argument with reference to the refused instruction. The first, Neiden v. State, 120 Neb. 619, 234 N. W. 563 (1931), involved a conviction for receiving stolen goods, in which the primary evidence against the defendant was provided by two parties who had already been convicted for stealing the goods in question. The court found that their testimony, as "confessed aiders in his [defendant's] buying of the stolen goods" was such that the jury might have inferred that the defendant had induced them to steal the goods; and based upon these facts and the definition of an accomplice as a "person who knowingly, voluntarily, and with common intent with the principal offender, unites in the commission of the crime," the court found the refusal to instruct the jury as to the weight to be given the testimony of the accomplices constituted reversible error. The instant case is clearly distinguishable from that case for the reason that we do not believe the evidence is sufficient to establish that Ranslem and Price were accomplices in this case, and for the further reason that in Neiden the

decision of the court was based partly upon its finding that the trial court had given no cautionary instruction as to the testimony of the witnesses. In the instant case, the trial court did instruct: "You are the sole judges of the credibility of the witnesses and the weight to be given to their testimony. In determining the weight which the testimony of the witness is entitled to receive you should consider: * * * 9. The fact that the witness was compelled to testify and granted immunity from prosecution; * * *." The above instruction was, clearly, an equivalent instruction to that requested by the defendant. We have held that the trial court may properly refuse a requested instruction where the substance of the request is covered in the instructions given. State v. Booth, 202 Neb. 692, 276 N. W. 2d 673 (1979).

The defendant also relies upon Steinmark v. Parratt, 427 F. Supp. 931 (D. C. Neb., 1977). That case, however, involved the use of a professional informer paid by the authorities, and hence is distinguishable from the instant case.

In view of what we have stated above, we conclude that the judgment and conviction of the defendant below must be set aside, and the case remanded for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.

CLINTON, J., dissenting.

I dissent for the reason that in my judgment the record discloses no evidence which would require inclusion in the jury charge the crime of murder in the second degree. The evidence justified only a verdict of guilty of murder in the first degree or acquittal. I would affirm the jury verdict.